THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
C. DOUG FYKE, Defendant-Appellant.

Fifth District   No. 5—87—0858

Opinion filed November 2, 1989.

714

Robert H. Rice, of Rice Law Office, of Belleville, for appellant.

Kenneth R. Boyle, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of Mt. Vernon, for the People.

JUSTICE RARICK delivered the opinion of the court:

C. Doug Fyke was charged in the circuit court of Marion County with the offense of murder. After a trial by jury, Fyke was found guilty and sentenced to 50 years in prison.

Fyke's conviction resulted from his participation in a conspiracy to kill Robert Alderson, Jr., whom the conspirators believed to be an informant. The conspirators included Fyke and his wife Tammy, Frank Volkmar, Paul Potts, Gary Daubman, Tim Clifton, and Gale Rankin. Volkmar and Potts were involved in drug dealing with the Fykes. Rankin was a friend of the Fykes and was living with them at the time of the murder.

Codefendant Paul Potts testified on behalf of the State. Several weeks prior to Alderson's murder, he and Volkmar were in Salem at the Fykes' house to obtain some marijuana to sell. Tammy Fyke took Volkmar and Potts to the garage, where there were huge stacks of marijuana, as well as numerous guns. While in the garage, Rankin entered and told Tammy that "Red" had called. "Red" was Alderson's nickname. Tammy became angry and stated that she was tired of "Red" talking so much and that she was going to "shut him down."

Sometime later, Tammy and Doug Fyke brought 45 to 50 pounds of marijuana to Volkmar's house in Alton. They believed the Salem police were about to make some drug-related arrests and didn't want anything in their house. Volkmar and Potts were to sell the marijuana in the Alton area. While there, Tammy Fyke said she wanted a man killed because he was talking too much, but Volkmar indicated that it would be better if the guy was just hurt, and that if he were hurt, it would leave the Salem area open. Daubman finally agreed to kill Alderson in exchange for drugs and money.

On September 4, 1986, Volkmar, Potts, and Gary Daubman drove to the Fykes' house in Salem because there was to be a party there. Daubman was worried that Alderson might be armed, so Volkmar obtained a .25 caliber pistol which he gave to Daubman, and Daubman brought the gun with him. Once there, Tammy Fyke, Daubman, and

Volkmar went into the kitchen, where they discussed drugging Alderson because they were afraid he might have a gun. Tammy and Doug Fyke made several phone calls in an attempt to find some drugs to use on Alderson. Doug Fyke and Volkmar then drove to a motel in Centralia where they met Tammy Williams, Alderson's girlfriend. Clifton had arranged for Williams to go to the motel with Keith Kirgan. Part of the conspirators' plan was to make Alderson believe that his girlfriend had been kidnapped. When Fyke and Volkmar arrived, Fyke left with Kirgan while Volkmar remained at the motel with Williams.

After dropping Kirgan off at Hardee's restaurant in Salem, Fyke returned home. Shortly thereafter, Rankin returned home from work to the party. Tammy Fyke asked Rankin to show Daubman how to use the gun. Rankin, Daubman, and Tammy then left for a place called "the bottoms" to practice shooting. Potts testified that he left at that point and went to a bar. When he returned to the Fykes' house several hours later, everybody was upset. Daubman stated that he didn't know why everyone else was upset because he was the one who had done it. Tammy Fyke stated that she was glad it was done. Doug Fyke asked if they were sure the victim was dead.

Potts, Daubman, and Volkmar then drove back to the Alton area in Rankin's car. Once they returned to Alton, they put the car behind Potts' brother's house in Rosewood Heights, and Volkmar dropped the gun in the Hartford canal.

Rankin testified that upon coming home from work, he, Tammy Fyke, and Gary Daubman drove to "the bottoms" to practice shooting. Later that evening, Rankin and Daubman returned to "the bottoms." Rankin was armed with a .38 caliber pistol and Daubman had the .25 caliber pistol. Shortly after arriving, Tammy Fyke drove up with Alderson. After a short conversation, Daubman ordered Alderson to lie on the ground. As Tammy and Rankin walked away, Rankin heard two or three shots. Rankin walked back to Daubman, retrieved the pistol, and drove away. Rankin also testified that he believed "Red" was going to be "talked to" and that he did not know he was to be killed. Rankin further testified that the day after the murder he, Tammy Fyke, and Tim Clifton went back to the scene of the murder, doused Alderson's body with gasoline, and set it on fire.

Fyke's first argument on appeal is that he was denied due process of law in that at the time the arrest warrant was issued, the information had not been sworn to as required by statute. The warrant was therefore invalid, he argues, and his subsequent arrest illegal. But for the illegal arrest, he maintains, he would not have made certain statements inculpating himself and such statements should have been sup-

pressed as the fruits of an illegal arrest. Because it is impossible to determine what the outcome of his trial would have been had those statements been suppressed, Fyke argues, he must be granted a new trial.

The record reveals that on the evening of September 9, 1986, the Salem police received information from the police in Alton implicating the Fykes in the murder of Alderson. Fearing that a suspect at large in the Alton area might telephone and warn them, the police and the State's Attorney immediately prepared an information, arrest warrants, and a search warrant. These documents were presented to Judge Richard Hodson by the State's Attorney and Agent Larry Coughlin of the Illinois Division of Criminal Investigation at 3 a.m. the following morning. Agent Coughlin was placed under oath by Judge Hodson and swore to the truthfulness of the statements in the affidavit supporting the complaint for search warrant and to the truthfulness of his answers to Judge Hodson's questions. Although apparently unnoticed at the time, the information had been signed by the State's Attorney but not verified. The information was subsequently verified by a notary public at 8 a.m., but by then Fyke had already been taken into custody.

■ Section 111—3(b) of the Code of Criminal Procedure of 1963 requires that an information be signed by the State's Attorney and sworn to by him or another (Ill. Rev. Stat. 1985, ch. 38, par. 111—3(b)), and a sworn information is a prerequisite to the issuance of an arrest warrant (*People v. Harding* (1966), 34 Ill. 2d 475, 216 N.E.2d 147). When the information was presented to Judge Hodson, a complaint for search warrant was also presented. This complaint set forth all of the facts upon which the information was based, and the statements contained in the complaint were sworn to by Agent Coughlin. The purpose of requiring an oath is to prevent groundless prosecutions by holding answerable on pain of perjury anyone who swears to an information. (*People v. Audi* (1979), 73 Ill. App. 3d 568, 392 N.E.2d 248.) Had the statements made by Agent Coughlin been untrue, he would have been guilty of perjury. The purpose of the statute was effectuated by Coughlin's sworn statements. As the requirement of oath is statutory as opposed to constitutional, the lack thereof does not in and of itself deprive the defendant of a fair trial. We note also that State's Attorney Matoush, who had prepared and signed the information, was present when the documents were presented to Judge Hodson, so there can be no doubt as to the authenticity of his signature on the information. Under the circumstances, we conclude that the statutory requirement of a sworn information was met and defendant suffered

no prejudice as a result of the procedure employed.

■■ In any event, we conclude that Fyke's arrest would have been valid without a warrant. Contrary to Fyke's assertion, we can determine from the record that there was sufficient probable cause for arrest without a warrant. By issuing an arrest warrant, the trial court necessarily determined that there was sufficient probable cause for arrest based upon the sworn statement of Agent Coughlin and, as Fyke was arrested outside his home, no warrant was necessary. (*United States v. Santana* (1976), 427 U.S. 38, 49 L. Ed. 2d 300, 96 S. Ct. 2406; *People v. Jones* (1983), 119 Ill. App. 3d 615, 456 N.E.2d 926.) Even if the information were invalid, the sworn statements of Agent Coughlin were sufficient to support a warrantless arrest.

We next address Fyke's argument that the trial court erred by permitting the State to introduce evidence of guns and ammunition not connected with the crime. Both Paul Potts and Agent Coughlin testified in detail about the guns which were discovered at the Fykes' residence. As it was uncontradicted that these weapons were not used to kill Alderson, Fyke maintains such evidence was highly prejudicial and served no probative purpose.

■■ ■ Initially, we note that prior to trial, Fyke agreed to permit the State to elicit testimony about the guns providing they would not be exhibited to the jury. Having acquiesced in the admission of this evidence, he has waived any potential error and cannot now complain. (*People v. Payne* (1983), 98 Ill. 2d 45, 456 N.E.2d 44.) In any event, we do not find the admission of this evidence to be erroneous. Evidence is relevant where it tends to prove a disputed fact or render a matter in question more or less probable. (*People v. Vella* (1985), 133 Ill. App. 3d 104, 478 N.E.2d 593.) Relevant evidence is admissible where it fairly tends to prove the offense charged. (*People v. Daniels* (1987), 164 Ill. App. 3d 1055, 518 N.E.2d 669.) In determining whether relevant evidence should be admitted, the trial court must balance the prejudicial effect of the evidence with its probative value. (*People v. Wright* (1986), 140 Ill. App. 3d 576, 488 N.E.2d 1344.) Whether evidence should be admitted rests with the sound discretion of the trial court, and the court's decision will not be reversed absent an abuse of that discretion. *People v. Lester* (1986), 145 Ill. App. 3d 720, 495 N.E.2d 1278.

■■ Fyke's defense was that he did not know that the others intended to kill Alderson. The presence of numerous weapons at the Fyke residence tends to indicate that the Fykes were prepared to use deadly force to defend their drug enterprise. The weapons were not stored or encased, but were lying out where they were readily accessi-

ble. Fyke admitted he and his wife sold drugs and that Rankin lived with them to protect them. Fyke also admitted being very angry with Alderson because he was "talking too much." The presence of the guns at his house tends to cast doubt on Fyke's claim that he did not know Alderson was to be killed, and we cannot say the trial court abused its discretion in finding the probative value of such evidence to outweigh its prejudicial effect. Further, this evidence tends to corroborate the testimony of the State's chief witness, Paul Potts, and is admissible for that purpose. *People v. Allison* (1985), 115 Ill. App. 3d 1038, 452 N.E.2d 148.

Even if the court's decision was an abuse of discretion, we again conclude that the error was harmless. Fyke admitted that Alderson was a threat to his drug business and that he heard the other conspirators discuss killing him. Fyke also suggested drugs that could be used on Alderson to incapacitate him so he could be killed more easily, and made efforts to obtain these drugs. Fyke further assisted in the conspiracy by taking Volkmar to the hotel to meet Alderson's girlfriend and by telling the victim to contact Tammy, who then drove him to the scene of his death. Given the evidence against Fyke, any possible prejudice resulting from the admission of testimony about the guns is relatively slight, and certainly not so great as to conclude that Fyke was denied a fair trial.

Fyke next contends that the trial court erred in instructing the jury on the law of accountability. People's instruction No. 14A, a modified version of Illinois Pattern Jury Instructions, Criminal, No. 5.03 (2d ed. 1981) (hereinafter IPI Criminal 2d) was given to the jury as follows:

> "A person is legally responsible for the conduct of another when, either before or during the commission of the offense charged, and with the intent to promote or facilitate the commission of *any* offense against the victim, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of *any* offense against the victim." (Emphasis added.)

At the time of the trial and of the offense in the instant case, IPI Criminal 2d No. 5.03 read:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense."

Fyke maintains that the instruction given told the jury that a defendant is responsible for another's conduct when before or during the commission of the offense charged, the defendant, with the intent to promote or facilitate "any" offense, aids in the commission or planning of "any" offense. In other words, this instruction tells the jury that if the defendant promotes or facilitates any offense at a time before or during the offense charged, he is guilty of the offense charged. Compounding this, Fyke contends instruction No. 11A told the jury that evidence had been received that he had been involved in "other offenses." It is possible, Fyke argues, that the jury believed that he was not guilty of murder on the theory of accountability, but because he was guilty of another offense which occurred before the murder, they were compelled to find him guilty of murder. The instructions given in this case were erroneous, Fyke maintains, and he is entitled to a new trial.

■■ ■ The instruction given in this case was a modified version of IPI Criminal 2d No. 5.03, which has been held by our supreme court to accurately state the law on accountability. (*People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223; *People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746.) The trial court specifically relied on *Caballero* and *Terry* when instructing the jury. The law on accountability incorporates the "common-design rule," which provides that where two or more persons engage in a common criminal design, any acts in the furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are accountable for those acts. (*Terry*, 99 Ill. 2d at 514, 460 N.E.2d at 749.) Even if the jury determined that Fyke did not know that Alderson was to be killed, he clearly knew that Alderson was to be "roughed up" and participated in the scheme to do so. Under the common-design rule, he is accountable for Alderson's murder.

We conclude that the instructions given the jury in this case properly stated the law on accountability.

Fyke also argues that the trial court erred in imposing a sentence of 50 years. He first contends that the trial court allowed the improper use of a victim impact statement at the sentencing hearing. A victim impact statement by Alderson's father was contained in the presentence investigation report. Alderson's father also testified at the sentencing hearing. Contained in the victim impact statement was a statement that Alderson's father believed that Fyke should receive the maximum punishment allowed by law. Fyke maintains that this information was improper.

■ Because Fyke failed to object to the testimony of Alderson's

father, this issue is waived. (*People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218.) Even if it were not waived, Fyke's argument is untenable. Consideration of victim impact statements is permitted by statute (Ill. Rev. Stat. 1987, ch. 38, par. 1005—4—1(a)(6)) and is constitutionally impermissible only in capital cases. (*Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529; *People v. Hines* (1988), 165 Ill. App. 3d 289, 518 N.E.2d 1362.) Further, our supreme court has recently held that victim impact statements are admissible (*People v. Felella* (1989), 131 Ill. 2d 525) and so we find no error in the admission of the victim impact statement.

■ Fyke next contends that the court did not adequately balance the seriousness of the crime with his rehabilitative potential. An examination of the record does not support this contention. The court rejected Fyke's contention that his crime was the result of circumstances not likely to reoccur, finding that because of the premeditated nature of the murder, it was not unlikely that Fyke would commit other crimes. The court also acknowledged that Fyke expressed remorse, but that the seriousness of the offense and its deliberate nature outweighed any expression of sorrow. It is evident from the record that the trial court did consider Fyke's rehabilitative potential and determined that it was not good. Based upon the evidence, we cannot say that finding was erroneous.

■ Fyke also argues that the trial court erroneously admitted into evidence statements made by several of his coconspirators. These written statements were identified by Agent Coughlin at Fyke's sentencing hearing. Fyke did not cross-examine Agent Coughlin about these statements, nor did he object to their admission into evidence. Any potential error is therefore waived. (*People v. Lewis* (1988), 165 Ill. App. 3d 97, 518 N.E.2d 741.) In any event, we note that the strict rules of evidence do not apply in sentencing hearings (*People v. Hall* (1986), 145 Ill. App. 3d 873, 495 N.E.2d 1379), and hearsay evidence is admissible if it is relevant and reliable. (*People v. Perez* (1985), 108 Ill. 2d 70, 483 N.E.2d 250.) We believe the statements were relevant and reliable and conclude that their admission did not constitute error.

Fyke also objects to the admission into evidence at the sentencing hearing of an evidence deposition from an aunt of one of the witnesses. The aunt stated that she had received several phone calls from a man who made death threats against the witness if he testified. Again, Fyke failed to object to the admission of the deposition. Were we to consider this issue, we would note that the trial judge made no reference to this evidence when pronouncing sentence, and there is nothing in the record indicating whether the trial judge was influenced by it. It

is presumed that a trial judge considers only competent and relevant evidence when determining a sentence. (*People v. Johnson* (1986), 114 Ill. 2d 170, 499 N.E.2d 1355.) Fyke has presented nothing to overcome that presumption.

■■ Next, Fyke maintains that the court was not justified in imposing an extended-term sentence. An extended-term sentence may be imposed when the defendant has been convicted of a felony and the trial court finds that the crime was accompanied by exceptionally brutal or heinous behavior. (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—8—2(a), 1005—5—3.2(b)(2).) It was Fyke's drug business that the conspirators were trying to protect. Fyke helped plan Alderson's murder and actively participated in the scheme to lure Alderson to the scene of his death, where he was executed. Fyke maintains that Alderson was not tortured or abused prior to his death, apparently arguing that the lack thereof demonstrates that Alderson's murder was not brutal or heinous. We do not agree. The dispassionate and calculated manner in which Alderson's murder was planned and carried out, and the motive behind it, demonstrates a lack of regard for human life which is so fundamentally evil that it cannot be said to be anything but brutal, heinous, and indicative of wanton cruelty. (*People v. Hickman* (1986), 143 Ill. App. 3d 195, 492 N.E.2d 1041.) We conclude that the imposition of the extended-term sentence was not an abuse of discretion. *People v. Boyle* (1987), 161 Ill. App. 3d 1054, 514 N.E.2d 1169.

■■ Finally, Fyke argues that the phrase "brutal or heinous behavior indicative of wanton cruelty" as used in section 5—5—3.2(b)(2) is unconstitutionally vague. We recently considered the constitutionality of this language in *People v. Barnhill* (1989), 188 Ill. App. 3d 299. In *Barnhill*, the defendant challenged the constitutionality of section 5—8—1(a)(1)(b), which permits a sentence of natural life for murder where the offense is accompanied by "brutal or heinous behavior indicative of wanton cruelty." In *Barnhill* this court held that the language was sufficiently indicative of the type of contact which warrants a sentence of natural life and was not unconstitutionally vague. (*Barnhill*, 188 Ill. App. 3d at 309.) The language of section 5—5—3.2(b)(2) is identical to that of section 5—8—1(a)(1)(b), and it is no less indicative of the type of conduct which warrants an extended-term sentence.

For the foregoing reasons, the judgment of the circuit court of Marion County is affirmed.

Affirmed.

WELCH, P.J., and GOLDENHERSH, J., concur.