# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Brunner*, 2012 IL App (4th) 100708

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID D. BRUNNER, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-10-0708 |
| Filed | April 3, 2012 |
| Rehearing denied | May 16, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's sentence to 55 years' imprisonment for first degree murder was upheld over his arguments that the evidence did not show that he personally killed the victim and that he was abused and unwanted as a child and had mental illnesses, since the jury could have concluded beyond a reasonable doubt that defendant personally killed the victim in the course of robbing her and taking her van, defendant's claim that he was convicted of first degree murder under a theory of accountability was unpersuasive, and defendant's mental or psychological impairment was not inherently mitigating. |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 06-CF-518; the Hon. Peter C. Cavanagh, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Michael J. Pelletier, Karen Munoz, and Martin J. Ryan, all of State Appellate Defender's Office, of Springfield, for appellant.

John Milhiser, State's Attorney, of Springfield (Patrick Delfino, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Pope and Cook concurred in the judgment and opinion.

## OPINION

¶ 1     In May 2010, a jury convicted defendant, David D. Brunner, of four counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (West 2006)), robbery (720 ILCS 5/18-1(a) (West 2006)), and possession of a stolen vehicle (625 ILCS 5/4-103(a)(1) (West 2006)).

¶ 2     Following an August 2010 hearing, the trial court merged defendant's first degree murder convictions and sentenced him to the following concurrent prison sentences: 55 years for first degree murder, 6 years for robbery, and 6 years for possession of a stolen vehicle.

¶ 3     Defendant appeals, arguing only that the trial court's imposition of a 55-year prison sentence was excessive. Specifically, defendant contends that the court abused its discretion by imposing that sentence because (1) the evidence did not show that defendant personally killed the victim and (2) defendant "was abused and unwanted as a child and has had substantial and long-standing mental illnesses." We disagree and affirm.

¶ 4                              I. BACKGROUND
¶ 5                           A. The State's Charges
¶ 6     Shortly after the police discovered Judy Schermerhorn's strangled body in her home in April 2006, the State charged defendant as follows: (1) first degree murder in that defendant intended to kill Schermerhorn (720 ILCS 5/9-1(a)(1) (West 2006)) (count I); (2) first degree murder in that defendant knew that his acts would cause her death (720 ILCS 5/9-1(a)(1) (West 2006)) (count II); (3) first degree murder in that defendant knew that his acts created a strong probability of her death (720 ILCS 5/9-1(a)(2) (West 2006)) (count III); (4) first degree murder in that while committing a forcible felony (robbery), defendant caused her death (720 ILCS 5/9-1(a)(3) (West 2006)) (count IV); (5) robbery (720 ILCS 5/18-1(a) (West 2006)) (count V); and (6) possession of a stolen vehicle (625 ILCS 5/4-103(a)(1) (West 2006)) (count VI).

¶ 7                              B. Defendant's Trial

¶ 8        Because defendant is not challenging the sufficiency of the evidence to sustain his convictions following his May 2010 jury trial, the facts relevant to this appeal are as follows.

¶ 9                      1. *The Evidence Presented by the State*

¶ 10       Megan Wanless testified that she was introduced to defendant in the early morning hours of April 29, 2006, by defendant's cousin, Terry Fairclough. Because defendant had crack cocaine and cannabis, Wanless decided to "hang out" and "party" with him. Several hours after driving to a lake to consume drugs, defendant drove to a local pawnshop where he sold silver flatware that he retrieved from the car's trunk. Thereafter, defendant drove to a home. While in the driveway of that home, defendant told Wanless that two days earlier, he had an argument with the owner of the home that ended when he strangled her to death. (Wanless later identified an exhibit that depicted Schermerhorn's home as the home she visited.)

¶ 11       Wanless entered the home with defendant, explaining that she did not believe defendant's story. Once inside, defendant searched for money and jewelry. Wanless followed defendant into a bedroom and noticed a lump on the bed that she believed was a pile of blankets. Defendant eventually found $30 in a checkbook. Defendant then drove Wanless to a motel where he rented a room, and they consumed drugs. The next morning, defendant returned to the home. As she sat in the car, Wanless later observed defendant leave the home, carrying jewelry and "egg-shaped" ornaments. After selling jewelry to a pawnshop, defendant drove Wanless to her friend's home. After a short time there, defendant became upset because Wanless would not show him the drugs she had received. As defendant left the home without Wanless, he backed the rear end of the car into a pole, shifted the car into drive, and hit a stop sign and a fence.

¶ 12       Police responded to a dispatch regarding defendant's accident, and upon arriving, observed defendant–who appeared unconscious–in the driver's seat. A preliminary investigation revealed that the car defendant had been driving was registered to Schermerhorn but displayed stolen license plates. As police continued their investigation, defendant exited the car and fled, but police quickly apprehended him. Paramedics later transported defendant to a hospital.

¶ 13       Wanless gave the police defendant's driver's license, explaining that she had it because defendant kept losing it during the two days she was with him. Wanless then asked if she could retrieve her possessions from the car. When an officer opened the car's trunk to retrieve Megan's poncho, he found two bags of jewelry, flatware, figurines, and Schermerhorn's driver's license. Concerned that Schermerhorn may have been burglarized, officers drove to the address on Schermerhorn's license. After their knocks at the front door went unanswered, officers entered the home through an unlocked window and found Schermerhorn's decomposing body on a bedroom mattress wrapped tightly in blankets. After an officer removed a portion of the blankets, he testified that Schermerhorn's head was wrapped in a plastic bag as if she was wearing a shower cap and that she had been gagged.

¶ 14       A forensic pathologist testified that (1) Schermerhorn's hands and feet were separately

bound by cloth material; (2) an electrical cord and cloth material were wrapped around her neck; (3) she was gagged by a piece of cloth that wrapped around her face, ending in a knot located at the back of her head; and (4) her entire body was wrapped in layers of blankets and bedding secured by electrical cords and a sash. The pathologist opined that Schermerhorn's death was caused by "ligature strangulation," with the possibility that the plastic bag placed over her head had contributed to her death by depriving her of oxygen.

¶ 15    The State elicited testimony from several witnesses that corroborated Wanless's testimony and showed that on April 28, 2006, defendant sold Fairclough a computer in exchange for drugs. The State's evidence also revealed that the computer defendant sold belonged to Schermerhorn, and a deoxyribonucleic acid (DNA) analysis could not exclude defendant as the contributor of DNA recovered from a sash used to secure a blanket to Schermerhorn's torso.

¶ 16    Thereafter, the trial court admitted three digital recordings of interviews police conducted with defendant. In those interviews, defendant provided the police with differing explanations regarding Schermerhorn's death, and he did so in the following order: (1) Schermerhorn had received threats from a man she hired who eventually stole her prescription pills; (2) during late April 2006, defendant often stopped by Schermerhorn's home and each time that she was not there, he would steal her belongings–including a computer–to support his drug habit; (3) defendant and his friend, "Lorenzo," devised a plan to rob Schermerhorn to cover his drug debts, which resulted in her unintentional death; and (4) defendant strangled Schermerhorn and tied her up because she threatened to use her organized-crime connections to harm his former girlfriend. (The digital recordings were played for the jury.)

¶ 17                              2. *The Evidence Presented by Defendant*

¶ 18    Defendant testified that he met Schermerhorn in February 2006 through his former girlfriend, who cleaned Schermerhorn's home. Schermerhorn worked from home, selling cosmetic products, and planned to sell jewelry over the Internet. Over the next two months, defendant became friends with Schermerhorn, assisting her by performing landscaping and home maintenance jobs. On April 27, 2006, Schermerhorn told defendant that a large amount of her jewelry was missing. Defendant admitted to her that he took the jewelry. To make amends, defendant stated that he entered into an agreement with Schermerhorn to defraud her homeowner's insurance provider by claiming that she had been robbed. Before defendant left Schermerhorn's home to return a van he borrowed from his cousin, Joey Brunner, she insisted that he return that night so that they could finalize their plans.

¶ 19    After smoking crack cocaine with Joey, defendant and Joey returned to Schermerhorn's home where they finalized a plan to tie Schermerhorn up, ransack her home, and anonymously report the burglary to the police. Defendant would then sell the stolen items out of state and provide Schermerhorn a portion of the proceeds to financially support her until her insurance check arrived. Defendant stated that after Schermerhorn agreed with the plan, he started rummaging through her home while Joey tied her up. A short time later, defendant informed Schermerhorn that they were leaving and she responded with a "muffled" sound.

¶ 20     Defendant recounted that as he drove away, Joey "flipped out" unexpectedly, and begged him to forget about reporting the robbery because Joey thought he may have killed Schermerhorn when he tied her up. Instead of calling 9-1-1, defendant drove Joey back to his home, returned to check on Schermerhorn, and confirmed that she was dead. Defendant then wrapped Schermerhorn's body in blankets to prevent her dog from "feeding" on her body.

¶ 21     Defendant explained that initially, he did not want to implicate Joey because he was "family" but after "sobering up" and "realizing exactly what just happened," he decided that "it's not fair to [Schermerhorn], to have who really killed her runnin[g] around." Defendant also (1) claimed that his videotaped explanations were lies and (2) acknowledged that he continued stealing from Schermerhorn's home after her death.

¶ 22                    3. *The Trial Court's Instruction to the Jury on Accountability*

¶ 23     In addition to the jury instructions the trial court provided regarding the propositions the State was mandated to prove beyond a reasonable doubt to sustain guilty verdicts on the counts charged, the court also instructed the jury on Illinois Pattern Jury Instructions, Criminal, No. 5.03A (4th ed. 2000), entitled, "Accountability–Felony Murder." Specifically, the court informed the jury as follows:

> "To sustain the charge of first degree murder, it is not necessary for the State to show that it was or may have been the original intent of the defendant or one for whose conduct he is legally responsible to kill the deceased, *** Schermerhorn.
>
> It is sufficient if the jury believes from the evidence beyond a reasonable doubt that the defendant or one for whose conduct he is legally responsible, combined to do an unlawful act, such as to commit Robbery, and that the deceased was killed by one of the parties committing that unlawful act."

¶ 24                                     4. *The Jury's Verdict*

¶ 25     On this evidence, the jury returned guilty verdicts on all six counts.

¶ 26                              C. Defendant's Sentencing Hearing

¶ 27                          1. *The Evidence Presented by the State*

¶ 28     At defendant's August 2010 sentencing hearing, a retired police officer testified that in January 1992, defendant stabbed Kenneth Logan–a person he had known for about a year–twice in the stomach. In March 1992, defendant pleaded guilty to aggravated battery and was later sentenced to 30 months' probation.

¶ 29     Detective Ryan Simms, the officer who investigated Schermerhorn's death, testified that in August 2006, defendant's cousin, Nicole Meredith, provided him a letter that defendant wrote to her. In his letter, defendant asked Meredith to contact his lawyer to confirm a story he heard while in jail that Joey bragged to Meredith how Joey had murdered Schermerhorn. The letter provided a detailed account of the story Joey purportedly told Meredith regarding Schermerhorn's death. (Defendant's written account of Joey's admission mirrored his May 2010 trial testimony.) Defendant also requested that Meredith not discuss his letter with

anyone but his lawyer and to destroy the letter after she finished reading it. Simms also described the content of a second letter defendant wrote to Meredith in July 2010, in which defendant expressed his rage upon learning that Meredith provided Simms the August 2006 letter. (Simms had earlier read defendant's August 2006 and July 2010 letters to the jury, and the trial court later admitted those letters into evidence.)

¶ 30  Defendant's August 2010 presentence investigation report (PSI) listed the following felony convictions, which were in addition to defendant's 1992 conviction for aggravated battery: (1) in March 2000, four years in prison for three separate felony theft convictions; (2) in July 2002, three years in prison for felony theft; and (3) in May 2004, 4 1/2 years in prison for theft by deception.

¶ 31  Defendant's PSI also provided the following synopsis of his "mental or emotional" condition:

"The defendant has had a psychiatric history with conduct disorders, problems as an adolescent[,] and a continuous issue with depression. His history of depression has caused sleep disturbances and past suicidal thoughts. He was first admitted to a psychiatric hospital at approximately age 12 or 13 *** for behavioral problems. At approximately 16 or 17, the defendant was again hospitalized *** for overdosing on [a]spirin due to being very depressed. On February 1, 1998, the defendant *** received a diagnosis for a Major Depressive disorder with substance abuse problems. To date, the defendant reported that he currently takes Wellbutrin for his depression and has received approximately 3 months of counseling for depression while in custody."

¶ 32                    2. *The Evidence Presented by Defendant*

¶ 33  The trial court admitted a forensic psychiatric evaluation conducted by Terry M. Killian, clinical assistant professor of psychiatry at Southern Illinois University School of Medicine. Killian's "principal diagnosis" was that defendant suffered from chronic and severe cocaine dependency. In his written evaluation, Killian recommended to the court that defendant's "life has been significantly disrupted by many things[,] which should be kept in mind in disposition [*sic*] of this case." Killian suggested that the court take into account the following "mitigation issues": (1) the abuse and neglect defendant suffered during his childhood, (2) defendant's undiagnosed attention deficit hyperactivity disorder, (3) defendant's lifetime history of depression, (4) defendant's mild post-traumatic stress disorder, (5) defendant's severe and chronic cocaine dependence, and (6) defendant's severe impairment at the time of the crime.

¶ 34                    3. *The Sentenced Imposed by the Trial Court*

¶ 35  At the sentencing hearing, the trial court stated that it had considered (1) the evidence presented at defendant's May 2010 trial, (2) the PSI, (3) the victim-impact statements, (4) the evidence and exhibits presented at the sentencing hearing, and (5) the parties' arguments. In addition, the court noted that it had carefully considered Killian's psychiatric report regarding defendant's childhood, abuse, and depression. The court then stated the following:

"[The court] note[s] that it was argued that the Defendant was very clearly given a chance, but it is clear from the Defendant's statement that *** Schermerhorn gave the Defendant *** more than one chance, and in fact, *** the jury found that it was clear that *** you were driven by an addiction, in that in your time of need, time of desperation, you went straight over to [Schermerhorn's] house to seek out help, and she was the one person, the one friend *** you thought might still be there for you, who might potentially help you. What's clear is that when you did go to *** Schermerhorn's house, the door was always open, you'll recall saying. [Despite] her response ***, you did turn on her, and you took her life. The jury had found that, and you then proceeded to systematically loot her home and drive around in her car over the next couple of days as if these were your items and your car, and that absolutely nothing was wrong, as *** Schermerhorn lay dead in her own bed. So that's what was proved at trial, and [Schermerhorn] was the one person who admittedly gave you a chance."

Thereafter, the court imposed the following concurrent prison sentences: 55 years for first degree murder (count I), 6 years for robbery, and 6 years for possession of a stolen vehicle. (The court did not sentence defendant on count II, III, or IV, finding that those counts had merged into his conviction on count I.)

¶ 36   This appeal followed.

¶ 37                    II. THE TRIAL COURT'S SENTENCE

¶ 38   Defendant appeals, arguing only that the trial court's imposition of a 55-year prison sentence was excessive. Specifically, defendant contends that the court abused its discretion by imposing that sentence because (1) the evidence did not show that defendant personally killed Schermerhorn and (2) defendant "was abused and unwanted as a child and has had substantial and long-standing mental illnesses." Defendant maintains that the court did not sufficiently consider these contentions and that they constitute mitigating factors against the imposition of such a harsh sentence. We address defendant's contentions in turn.

¶ 39                    A. The Standard of Review

¶ 40   The sentence imposed by a trial court is granted great deference because the court is generally in a better position than a reviewing court to weigh factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, and habits. *People v. Calabrese*, 398 Ill. App. 3d 98, 126, 924 N.E.2d 6, 29 (2010). This deference provides a trial court the latitude to impose a sentence that falls within the statutory range prescribed for the offense. *People v. Perkins*, 408 Ill. App. 3d 752, 763, 945 N.E.2d 1228, 1238 (2011). A sentence that is within statutory limits is excessive and, thus, an abuse of the court's discretion only when it is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense. See *People v. Luna*, 409 Ill. App. 3d 45, 52, 946 N.E.2d 1102, 1110 (2011).

B. The Statutory Aggravating and Mitigating Factors

¶ 42                         1. *The Statutory Mitigating Factors*

¶ 43      Section 5-5-3.1 of the Unified Code of Corrections (Unified Code), entitled, "Factors in Mitigation," provides the following sentencing guidance:

"(a) The following grounds shall be accorded weight in favor of withholding or minimizing a sentence of imprisonment:

(1) The defendant's criminal conduct neither caused nor threatened serious physical harm to another.

(2) The defendant did not contemplate that his criminal conduct would cause or threaten serious physical harm to another.

(3) The defendant acted under a strong provocation.

(4) There were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense.

(5) The defendant's criminal conduct was induced or facilitated by someone other than the defendant.

(6) The defendant has compensated or will compensate the victim of his criminal conduct for the damage or injury that he sustained.

(7) The defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present crime.

(8) The defendant's criminal conduct was the result of circumstances unlikely to recur.

(9) The character and attitudes of the defendant indicate that he is unlikely to commit another crime.

(10) The defendant is particularly likely to comply with the terms of a period of probation.

(11) The imprisonment of the defendant would entail excessive hardship to his dependents.

(12) The imprisonment of the defendant would endanger his or her medical condition.

(13) The defendant was mentally retarded as defined in Section 5-1-13 of [the Unified] Code.

(b) If the court, having due regard for the character of the offender, the nature and circumstances of the offense and the public interest finds that a sentence of imprisonment is the most appropriate disposition of the offender, or where other provisions of this Code mandate the imprisonment of the offender, the grounds listed in paragraph (a) of this subsection shall be considered as factors in mitigation of the term imposed." 730 ILCS 5/5-5-3.1 (West 2006).

Thus, section 5-5-3.1 of the Unified Code requires a trial court to consider the 13 aforementioned mitigating factors listed, if present, in mitigation.

¶ 44                              2. *The Statutory Aggravating Factors*

¶ 45        Section 5-5-3.2(a) of the Unified Code, entitled "Factors in Aggravation," sets forth 22 factors that a trial court is required to consider, if present, in aggravation. In particular, section 5-5-3.2(a) provides, in part, the following:

"(a) The following factors shall be accorded weight in favor of imposing a term of imprisonment or may be considered by the court as reasons to impose a more severe sentence under Section 5-8-1:

(1) the defendant's conduct caused or threatened serious harm;

(2) the defendant received compensation for committing the offense;

(3) the defendant has a history of prior delinquency or criminal activity;

(4) the defendant, by the duties of his office or by his position, was obliged to prevent the particular offense committed or to bring the offenders committing it to justice;

(5) the defendant held public office at the time of the offense, and the offense related to the conduct of that office;

(6) the defendant utilized his professional reputation or position in the community to commit the offense, or to afford him an easier means of committing it;

(7) the sentence is necessary to deter others from committing the same crime;

* * *

(12) the defendant was convicted of a felony committed while he was released on bail *** pending trial for a prior felony and was convicted of such prior felony, or the defendant was convicted of a felony committed while he was serving a period of *** mandatory supervised release ***;

(13) the defendant committed or attempted to commit a felony while he was wearing a bulletproof vest." 730 ILCS 5/5-5-3.2(a) (West 2006).

The majority of the remaining 13 statutory aggravating factors listed under section 5-5-3.2(a) of the Unified Code pertain either to the (1) age, medical condition, race, gender, or employment status of the victim; (2) the defendant's personal or professional relationship to the victim; or (3) where the crime was committed, which includes, in part, churches, nursing homes, or day-care facilities. 730 ILCS 5/5-5-3.2(a) (West 2006).

¶ 46                          C. Defendant's Excessive-Sentence Claims

¶ 47                    1. *Defendant's Claim That the Evidence Did Not Show*
                           *That He Personally Killed the Victim*

¶ 48        As previously stated, defendant contends that the trial court abused its discretion by imposing a 55-year sentence because the evidence did not show that defendant personally killed the victim. Specifically, defendant asserts that the absence of direct evidence that he planned to kill Schermerhorn or personally kill her was a mitigating factor that the court did not sufficiently consider and militated against the imposition of such a harsh sentence. We

reject defendant's contention.

¶ 49 Although the plain language of sections 5-5-3.1 and 5-5-3.2(a) of the Unified Code mandates that, if present, the trial court must *consider* the enumerated 13 mitigating and 22 aggravating factors, respectively, in determining a sentence of imprisonment, those factors are not an exclusive listing that prohibits a court from considering any other relevant sentencing factor.

¶ 50 In *People v. Ward*, 113 Ill. 2d 516, 525, 499 N.E.2d 422, 425 (1986), the supreme court rejected the defendant's argument that the trial court erred by considering his claims of innocence as an aggravating factor. In so doing, it provided the following guidance:

"The imposition of a criminal sentence should not be reduced to a litany of accepted and approved but meaningless words and phrases. In determining the appropriate sentence, the trial judge must consider all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and *indeed every aspect of his life relevant to the sentencing proceeding*. [Citations.] In some instances and under certain factual circumstances, a continued protestation of innocence and a lack of remorse may convey a strong message to the trial judge that the defendant is an unmitigated liar and at continued war with society. Such impressions garnered by the trial judge from the entire proceeding are proper factors to consider in imposing sentence. This court has held that it was not improper for the trial court to consider its perception of the defendant's perjury in fixing the penalty to be imposed. [Citation.] We believe that the impact of the defendant's testimony and statement upon the trial judge, assessed in light of the other information revealed during the course of the trial and the sentencing hearing, can hardly be said to be irrelevant to an appraisal of the defendant's character and his prospects for rehabilitation." (Emphasis added.) *Ward*, 113 Ill. 2d at 527-28, 499 N.E.2d at 426.

See *People v. Dowding*, 388 Ill. App. 3d 936, 943, 904 N.E.2d 1022, 1029 (2009) (in determining the appropriate sentence to impose, a trial court may consider as an aggravating factor the degree of harm to the victim, the manner in which the victim's death was brought about, as well as the seriousness, nature, and circumstances of the offense); *Perkins*, 408 Ill. App. 3d at 763, 945 N.E.2d at 1238 (citing *Ward* approvingly for the proposition that a trial court should not arbitrarily consider a claim of innocence as an aggravating sentencing factor but under other circumstances, a defendant's lack of remorse or denial of guilt may be properly considered by the court with regard to the defendant's prospects for rehabilitation).

¶ 51 Defendant concedes that he is accountable for Schermerhorn's murder, but claims that "who actually killed [Schermerhorn] has relevance to the sentence imposed." Defendant posits further, as follows:

"The harsh 55-year prison sentence imposed *** would have been appropriate had [defendant] personally killed (or planned to kill) *** [Schermerhorn]. However, there is no suggestion in the record that [defendant] personally killed her, despite the court's erroneous finding at sentencing that [defendant] took [Schermerhorn's] life."

¶ 52 Defendant's analysis regarding the sentence the trial court imposed is consistent with *Ward.* We agree that the court could have considered–as an aggravating sentencing factor–that defendant, a lifetime drug abuser, had callously murdered Schermerhorn, stolen

her possessions to support his drug habit, and then continually lied about the circumstances surrounding her death. Indeed, the legislature had addressed this issue, albeit in the context of the death penalty statute under section 9-1(b)(6)(a)(i) of the Criminal Code of 1961 (Criminal Code), which stated that a defendant who had been found guilty of first degree murder may be sentenced to death if the murdered individual was killed in the course of another felony if the murdered individual "was actually killed by the defendant." 720 ILCS 5/9-1(b)(6)(a)(i) (West 2006). We note that the list of death-penalty-eligibility factors was listed in section 9-1(b) of the Criminal Code under the heading "Aggravating Factors." 720 ILCS 5/9-1(b) (West 2006).

¶ 53    First, we find unpersuasive defendant's underlying claim that the jury found him guilty of Schermerhorn's death solely under the theory of accountability. On this record, the jury could easily have drawn the inferences necessary to conclude beyond a reasonable doubt that defendant personally killed Schermerhorn. See *People v. Washington*, 2012 IL 110283, ¶ 60 (the jury's function is to assess witness credibility, weigh the evidence, resolve conflicting evidence, and draw reasonable inferences therefrom).

¶ 54    More significantly, the fatal flaw in defendant's argument that the trial court erred by imposing a 55-year sentence is his proposed treatment of the *absence* of an aggravating factor. Even if we were to accept defendant's claim that the jury convicted him of first degree murder under an accountability theory, which we have already concluded we do not, we reject defendant's suggestion that the absence of evidence that he personally killed Schermerhorn–in other words, the absence of a possible aggravating factor–*must* be considered by the court as a mitigating factor, resulting in the downward departure from the sentence the court would have otherwise imposed.

¶ 55    2. *Defendant's Claim That His Sentence Was Excessive*

*Given His Personal History*

¶ 56    Defendant also contends that the trial court abused its discretion by imposing a 55-year sentence because he "was abused and unwanted as a child and has had substantial and long-standing mental illnesses." We disagree, noting that the supreme court has previously considered and rejected such arguments.

¶ 57    a. The Supreme Court's Decisions in *Shatner* and *Coleman*

¶ 58    In *People v. Shatner*, 174 Ill. 2d 133, 137, 673 N.E.2d 258, 260 (1996), a jury convicted the defendant of first degree murder, robbery, and arson. After the defendant waived his right to a jury at his sentencing hearing, the trial court found (1) the defendant was eligible for the death penalty based on the aggravating factor that he killed the victim in the course of committing another felony and (2) that no mitigating factors were present to prevent the imposition of that ultimate penalty. *Shatner*, 174 Ill. 2d at 138, 673 N.E.2d at 260. Thereafter the court sentenced the defendant to death. *Shatner*, 174 Ill. 2d at 138, 673 N.E.2d at 260. The defendant appealed, arguing, in pertinent part, that the court erred by considering his history of drug abuse solely in aggravation. *Id.*

-11-

¶ 59    In rejecting the defendant's claim, the supreme court stated the following:

"Defendant does not claim that the sentencing judge refused to hear or believed he was somehow precluded from viewing the drug abuse history evidence as mitigating. Rather, defendant essentially asserts that the sentencer should have found that defendant's drug abuse history in part explained his criminal behavior. Underlying this premise is that since drugs are partly to blame for his actions, the defendant is somehow less culpable and should not suffer the ultimate penalty for his criminal behavior. Simply stated, the sentencing judge was under no legal obligation to subscribe to this suggestion. To the contrary, the sentencing judge was free to conclude, under the circumstances, that defendant's drug history simply had no mitigating value but was, in fact, aggravating." *Shatner*, 174 Ill. 2d at 160, 673 N.E.2d at 270.

¶ 60    In *People v. Coleman*, 183 Ill. 2d 366, 401, 701 N.E.2d 1063, 1081 (1998), another death-penalty case, the defendant claimed ineffective assistance of counsel during his sentencing hearing because defense counsel failed to investigate potential sources of mitigation. In support of his postconviction petition, the defendant attached several affidavits from family members, each essentially claiming that the defendant was "the product of an impoverished, chaotic household in which he was subjected to chronic abuse and neglect" that eventually caused the defendant to develop a long-term dependence on drugs. *Id.* The defendant also attached a psychological evaluation and social history investigation report that detailed the impairment of his emotional development as a result of his long-term drug use. *Coleman*, 183 Ill. 2d at 401-02, 701 N.E.2d at 1081.

¶ 61    In rejecting the defendant's ineffective-assistance-of-counsel claim, the supreme court stated that it, as well as other courts, had noted that a history of substance abuse is a "double-edged sword at the aggravating/mitigating phase of the penalty hearing." *Coleman*, 183 Ill. 2d at 404, 701 N.E.2d at 1082. In this regard, the supreme court continued, as follows:

"With respect to the proffered evidence of the impairment of defendant's emotional development, this court has repeatedly held that 'information about a defendant's mental or psychological impairment is not inherently mitigating.' [Citation.] As we explained in [*People v. Tenner*, 175 Ill. 2d 372, 382, 677 N.E.2d 859, 864-65 (1997)], '[a]t sentencing, a judge or jury considering evidence of this nature might view the information as either mitigating or aggravating, depending, of course, on whether the individual hearing the evidence finds that it evokes compassion or demonstrates possible future dangerousness.' " *Coleman*, 183 Ill. 2d at 406, 701 N.E.2d at 1083.

¶ 62                    b. The Substance of Defendant's Mitigation Claim

¶ 63    Defendant concedes in his brief to this court that he had "a role in [Schermerhorn's] death," but asserts that because he experienced an abusive childhood that he exacerbated by continually abusing drugs throughout his life, which adversely impacted his mental health, the trial court should not have imposed a 55-year sentence. Defendant's assertion is unpersuasive.

¶ 64    We first note that defendant's claimed mitigating factors of an abusive childhood, mental-health problems, and substance-abuse issues are not set forth in the list of mitigating

-12-

factors in section 5-5-3.1(a) of the Unified Code that "shall be accorded weight in favor of withholding or minimizing a sentence of imprisonment." 730 ILCS 5/5-5-3.1(a) (West 2006). Indeed, our review of the 13 mitigating factors reveals that none would apply under the circumstances in this case. Given that the General Assembly has twice amended section 5-3-3.1 since the supreme court's decisions in *Shatner* and *Coleman* and has not seen fit to include a defendant's mental-health issues among the listed mitigating factors (see Pub. Act 86-903, § 1, eff. Jan. 1, 1990 (1989 Ill. Laws 5001); Pub. Act 91-357, § 247, eff. July 29, 1999 (1999 Ill. Laws 3647, 4588)), we conclude that this omission is no oversight.

¶ 65    As the supreme court noted in *Shatner* and reaffirmed in *Coleman*, defendant's claims regarding his dire circumstances present a double-edged sword–that is, although defendant claims that his specific circumstances are mitigating factors, the trial court could have also considered all, some, or none as mitigating or aggravating factors.

¶ 66    Defendant's mitigation claim is essentially a plea to this court to give him another chance by vacating his sentence and remanding for the imposition of a shorter period of imprisonment because–as in *Shatner*–he is less culpable as a result of his dismal life history. Despite his urging to the contrary, however, the following factors support the trial court's imposition of a 55-year prison sentence, especially given that defendant has continually demonstrated–by his criminal history–that he cannot conform his behavior to societal norms: defendant's (1) abusive childhood, which defendant cannot change; (2) mental-health issues, which Killian documented will continue to exist throughout defendant's life; and (3) severe and chronic drug dependence, which defendant has demonstrated his unwillingness to curb.

¶ 67                                    III. CONCLUSION

¶ 68    For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $50 statutory assessment against defendant as costs of this appeal.

¶ 69    Affirmed.