# Illinois Official Reports

## Appellate Court

---

### *People v. Olson*, 2019 IL App (2d) 170334

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEVIN M. OLSON, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-17-0334 |
| Filed | April 24, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 15-CF-2981; the Hon. Ronald J. White, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and James K. Leven, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Marilyn Hite Ross, State's Attorney, of Rockford (Patrick Delfino, David J. Robinson, and Stephanie Hoit Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion.<br>Justices Jorgensen and Hudson concurred in the judgment and opinion. |

## OPINION

¶ 1        Defendant, Devin M. Olson, appeals orders revoking his probation and sentencing him to six years' imprisonment for aggravated domestic battery (720 ILCS 5/12-3.3(a-5) (West 2014)). He contends that the trial court erred in (1) refusing to allow the victim to withdraw her written victim impact statement and (2) refusing to consider the nonstatutory mitigating factor that the victim wished defendant to receive probation. We affirm.

¶ 2        Defendant was charged following an incident with his former girlfriend, A.M. Following a conference under Illinois Supreme Court Rule 402 (eff. July 1, 2012), the court informed defendant that he could be sentenced to probation with a number of conditions, with which the court "would expect [him] to comply 100 percent." The court said that defendant's attorney would tell him what the court would "do if there's a violation of any one of those conditions."

¶ 3        A.M. and her mother, Cathy Pompeo, submitted victim impact statements. A.M., who had a daughter with defendant, wrote, "I have experienced nightmares of [defendant] attacking my family & I and killing me." Defendant "has stalked me before and has told me word for word 'B***, I will always be a step ahead of you.' " Defendant had given her "black eyes, fat lips, bruises, soreness, marks from being whipped [with] a hanger." A.M. also wrote that she believed that defendant would "kill [her] even in front of our daughter." A.M. requested that defendant be sent to prison.

¶ 4        Pompeo wrote that her 13-year-old son was afraid of defendant, constantly checking that all the doors and windows were locked. If defendant were released without "proper psychiatric help," she would fear for her daughter's life. Defendant had "an obsessive idea in his head that [A.M.] and him should be together. He had threatened to *Kill* himself and then to *Kill* her and to leave their baby parentless." (Emphases in original.) That same day, defendant had slit his throat and wrists. Pompeo felt that defendant needed inpatient psychiatric help.

¶ 5        On April 1, 2016, defendant entered a negotiated plea to aggravated domestic battery. Under the agreement, defendant would be placed on probation for 30 months, including 94 days in jail, which had already been served, and an additional 90 days of periodic imprisonment. Defendant would be released only for mental health treatment and to attend the victim impact panel. Further, defendant was to have no contact with A.M. or their child.

¶ 6        As a factual basis, the prosecutor stated that on December 29, 2015, police were called to A.M.'s home. A.M. said that defendant had battered her in their apartment and fled. A.M. stated that they had been arguing about "relationship issues," at which point defendant kicked her in the leg, punched her in the body, and then choked her until she lost consciousness. After A.M. woke up, defendant choked her again, although she did not lose consciousness.

¶ 7        As part of the agreement, other, apparently unrelated, charges were dismissed. Defendant also received an agreed sentence of court supervision for a previous conviction of driving under the influence.

¶ 8        The following colloquy ensued:

"THE COURT: And I am going to say that again. Listen to me, you are to have no contact directly or in directly [*sic*] with [A.M.]; do you understand?

THE DEFENDANT: Yes, [Y]our Honor.

THE COURT: Because if you violate that—and I am going to monitor that—if you violate that I am going to sentence you to the Department of Corrections for 7 years,

and I would ask the State respectfully, if there's a violation, notify the Court immediately."

¶ 9 Defendant was released from periodic imprisonment on July 2, 2016. On August 11, 2016, a bench warrant was issued after he failed to appear for a scheduled court date. On August 15, the State moved to revoke defendant's probation, alleging that he made contact with A.M. on August 11 and that he failed to appear in court on that date.

¶ 10 On October 31, 2016, the court found that defendant had violated his probation and set the matter for sentencing. Near the conclusion of the sentencing hearing, A.M. asked to address the court.

¶ 11 A.M. stated, "I would never choose [defendant] over my daughter." She stated that she was "[w]hipped with hangers" when she was pregnant and that, although she was living with defendant's family, they went to a festival "while [she] was tortured." She further stated as follows:

"I was choked out to the point where I was unconscious. To me that's attempt to murder. Six months? And then you get out and you come to my house. That's not fair.

Probation again? What's going to happen to me? What's going to happen to my daughter? He's never going to give up. He's going to find me. Whatever happens—one day he's going to kill me. I believe that he's going to kill me. And it's up to you guys to make sure that doesn't happen. Please protect me and my daughter."

¶ 12 The trial court sentenced defendant to six years' imprisonment. Defendant moved to reconsider the sentence, arguing, *inter alia*, that A.M.'s request to address the court surprised him and left him unprepared. The court granted the motion. It set a new sentencing hearing, stating that it would not consider the evidence at the previous hearing.

¶ 13 At the second sentencing hearing, A.M. asked to withdraw her victim impact statement. The trial court denied that request but allowed her to make a second oral statement. She said that she had changed her mind "about this whole thing." She stated, "I just look at when it's just me and my daughter, I don't think he should do five [*sic*] years." She explained that defendant was mentally ill. The most important thing was for defendant to get help for his mental illness, which he would not get in prison. She previously had let other people make up her mind for her. She "did not lie on the stand about what actually happened" but now felt that it should be handled differently. She did not want her daughter to "have a parent that is ruined by jail when maybe there's a better way we can do this." After defendant was previously sentenced to prison she "felt no type of relief." She stated, "[T]here's got to be a better way to do this besides five years, and [defendant] gets out, and he's 25, and his kid's six and a half."

¶ 14 Pompeo testified that defendant's mother, Jenny Olson, had changed A.M.'s mind about how defendant should be sentenced. A.M. changed her mind while Pompeo was in New York. Pompeo believed that Jenny had contacted A.M. during that time.

"[A]ll of a sudden now she's getting the victim's guilt is what she's getting, and she's being put into the same situation that has happened more than one time when [defendant]'s family tried to make her feel bad for calling the police, when the attorney for [defendant] said are you just doing this for—because you have a family case against. She is just being put as a victim again."

On cross-examination, she testified that she was not present for any conversations between A.M. and Jenny.

¶ 15    Jenny testified that defendant would have to follow the rules of probation and her own rules if he lived with her. She denied trying to influence A.M. but acknowledged that she talked with her about her daughter and "how it's gonna affect her not having a father in her life."

¶ 16    Defendant testified that his grandmother's death and his parents' divorce when he was 15 or 16 years old triggered major depression and anxiety. He began abusing drugs, missed some school, and generally lost his motivation. He was placed on juvenile probation. In 2015, he suffered an injury and was prescribed narcotics, to which he became addicted. When the prescription ran out, he sought drugs on the streets. However, those issues had been addressed and resolved through counseling. Defendant had also recently come to grips with his depression. Through counseling and classes, he felt better equipped to manage his symptoms.

¶ 17    During his recent probation, he received outpatient counseling. He completed these programs successfully. He wanted to continue taking substance abuse classes but could not because there were others on the waiting list.

¶ 18    Defendant promised to remain drug and alcohol free, to continue to better himself through counseling, and to stay away from A.M. He hoped to someday have a relationship with their daughter. On cross-examination, defendant admitted that he did not comply with the conditions of his probation.

¶ 19    Zack Adams, defendant's probation officer, testified that, while on periodic imprisonment, defendant was in programs to help him manage depression and he did well in them. He also received anxiety support and mental health counseling. He attended domestic violence classes before being rearrested. Defendant had two rules violations for reporting late to the jail. Defendant explained that one time he was with his counselor. On the other occasion, he stopped to get fast food before returning to jail but it took longer than expected.

¶ 20    In imposing sentence, the court noted "the fact that [A.M.] has wished that the court consider her statements." The court agreed that defendant had mental health issues that the juvenile court system had not addressed, and it expressed doubt that suitable services would be provided by the Department of Corrections. Nevertheless, the court could not overlook defendant's numerous probation violations, including testing positive for controlled substances, failing to report to probation, failing to participate in programs ordered by the probation department, leaving Illinois, and failing to pursue a course of work or study. The court commented that defendant went to A.M.'s house at 1 a.m. The court considered that more serious than if defendant had merely called her or tried to see her during the daytime.

¶ 21    The court stated, "I considered that after that young lady testified, my first indication was perhaps I would give this young man probation," but believed that, based on the totality of the circumstances, defendant was a threat to A.M. The court noted that, when defendant was in a controlled environment, he did well. The court thus resentenced defendant to six years' imprisonment. After the court denied his motion to reconsider the sentence, defendant timely appealed.

¶ 22    Defendant first contends that the trial court erred by refusing to allow A.M. to withdraw her initial victim impact statement. The Rights of Crime Victims and Witnesses Act (Act) gives a victim the right to present an oral or written victim impact statement. 725 ILCS 120/6 (West 2016). The Act further provides that, whenever a victim has a right to be heard, he or she has the right to be heard "in any reasonable manner the victim chooses." 725 ILCS 120/4.5(c-5)(6) (West 2016). However, the Act, like the victim's rights section of the Illinois Constitution that it effectuates, provides that it is not a basis for appellate relief to a defendant. Ill. Const. 1970,

art. I, § 8.1; 725 ILCS 120/9 (West 2016); see *People v. Richardson*, 196 Ill. 2d 225, 231 (2001). Thus, even if the trial court failed to enforce A.M.'s rights, defendant lacks standing to complain about it.

¶ 23    In any event, A.M. was allowed to address the court, both orally and in writing. In her second oral statement, she did not recant her factual assertions about defendant's abuse and stalking. She merely expressed a different opinion about what sentence defendant should receive.

¶ 24    There is no provision in the Act for withdrawing a victim impact statement once it has been given. Here, the court allowed A.M. to speak freely at the second sentencing hearing and to explain the changes from the prior written statement. The Act requires nothing more.

¶ 25    The Act provides that, if a victim makes a statement, the trial court "shall" consider it. 725 ILCS 120/6(a) (West 2016). While this provision is not mandatory (*Richardson*, 196 Ill. 2d at 232), it nevertheless gives the court discretion to consider the statement. And the court did not abuse its discretion in light of the impassioned tone of A.M.'s earlier statement and Pompeo's testimony that A.M. changed her mind only after being pressured by defendant's mother.

¶ 26    Finally, while the victim may recommend a sentence (see *People v. Fyke*, 190 Ill. App. 3d 713, 720-21 (1989)), the ultimate decision belongs to the trial court (*People v. Nussbaum*, 251 Ill. App. 3d 779, 782-83 (1993)). Moreover, the ordinary rules of evidence are relaxed during sentencing, and as long as the evidence is relevant and reliable, the court may search diligently for evidence in aggravation or mitigation. *People v. Blanck*, 263 Ill. App. 3d 224, 234 (1994). Thus, the court was entitled to rely on A.M.'s assertions in her written statement that defendant had abused and stalked her and that she felt threatened by him.

¶ 27    Defendant next contends that the trial court erred by refusing to consider the "non-statutory mitigating factor" that A.M. did not want defendant to go to prison. Section 5-5-3.1(a) of the Unified Code of Corrections states that certain enumerated grounds "shall be accorded weight in favor of withholding or minimizing a sentence of imprisonment." 730 ILCS 5/5-5-3.1(a) (West 2016). However, "those factors are not an exclusive listing that prohibits a court from considering any other relevant sentencing factor." *People v. Brunner*, 2012 IL App (4th) 100708, ¶ 49. "If mitigating evidence was before the trial court, we presume that the court considered it." *People v. Starnes*, 374 Ill. App. 3d 329, 337 (2007).

¶ 28    The trial court's comments strongly indicate that it did consider A.M.'s wishes about the sentence but found those concerns outweighed by numerous aggravating factors. Defendant's real contention appears to be that the trial court gave insufficient weight to this factor, but it is not our function to reweigh the factors in aggravation and mitigation. See *People v. Scott*, 2015 IL App (1st) 131503, ¶ 56 (reviewing court may not reweigh aggravating and mitigating factors and may not substitute its judgment for the trial court's merely because it could have weighed factors differently).

¶ 29    Defendant does not contend that the sentence was otherwise an abuse of discretion. The court carefully balanced the aggravating and mitigating factors and concluded that a prison sentence was necessary to protect A.M. and her daughter, as well as to deter others from committing similar offenses. The victim impact statements show that this was not an isolated incident but part of a pattern of abuse. Defendant was initially given a chance at probation. However, approximately five weeks after being released from periodic imprisonment, he contacted A.M. by showing up outside her window at 1 a.m., missed a court date because he

had left Illinois without permission, and failed two drug tests, leading the court to observe that defendant does well in a controlled environment but much less so when released.

¶ 30        The judgment of the circuit court of Winnebago County is affirmed. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 31        Affirmed.