# Illinois Official Reports

## Appellate Court

---

### *People v. Wheeler*, 2019 IL App (4th) 160937

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. QMONI K. WHEELER, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-16-0937 |
| Filed | May 10, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 15-CF-92; the Hon. Rudolph M. Braud Jr., Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Stephen L. Gentry, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Daniel K. Wright, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and Luke McNeill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Presiding Justice Holder White and Justice Turner concurred in the judgment and opinion. |

**OPINION**

¶ 1    In November 2016, the trial court sentenced defendant, Qmoni K. Wheeler, to a 90-year prison sentence for the multiple violent felonies he committed when he was 18 years old. Defendant appeals, arguing that the trial court's imposition of an aggregate 90-year prison sentence (1) was an abuse of discretion, (2) cannot be justified on the basis of rehabilitation, and (3) is not necessary for the protection of the public because the State "offered to accept a plea in exchange for a 38-year sentence." We disagree and affirm.

¶ 2                                I. BACKGROUND
¶ 3                                A. The Indictment
¶ 4    In September 2015, a grand jury indicted defendant for (1) residential burglary, (2) home invasion, (3) aggravated criminal sexual assault (penis to vagina), (4) aggravated criminal sexual assault (penis to mouth), (5) theft of property exceeding $500 in value, (6) aggravated battery, (7) aggravated unlawful restraint, and (8) aggravated unlawful use of a weapon. 720 ILCS 5/19-3, 19-6(a)(2), 11-1.30(a)(8), 16-1(a)(1)(A), 12-3.05(f)(1), 10-3.1(a), 24-1.6(a)(1), (a)(3)(A-5) (West 2014).

¶ 5                             B. The Pretrial Hearing
¶ 6    In September 2016, the trial court conducted a pretrial hearing. Defense counsel informed the court that the State had offered defendant a sentence of 38 years in prison to be served at 85%. Defense counsel did not elaborate further regarding the terms of the offer but informed the court that defendant refused it and intended to proceed to trial.

¶ 7                                C. The Jury Trial
¶ 8    At defendant's September 2016 jury trial, S.M. testified that on November 22, 2014, she was preparing to take a shower at her home when she heard a banging sound downstairs. She tried to determine the reason for the noise when three men with guns confronted her. Two of the men were masked.

¶ 9    One of the masked men hit her with a revolver and "broke [her] jaw in two places." This man "grabbed [S.M.] by the arm and took [her] upstairs." The man took S.M. into a bedroom, placed a gun to her head, and ordered S.M. to "suck his dick." S.M. recounted that she was "trying to move the gun away from [my] head, and he told me to leave his shit alone and to suck his dick. And I—so, I did." S.M. stated that she "felt like he was going to kill me if I didn't. I felt like he was going to kill me anyway." On direct examination, S.M. testified that the man raped her:

> "Q. Now, [S.M.], do you recall if he was erect or not when you first placed his penis in your mouth?
>
> A. I don't believe he was. When he got erect, he told me to turn around, bend over.
>
> Q. And did he stand you up at that point?
>
> A. Yes.
>
> Q. When you were standing up, he said turn around; is that correct?
>
> A. Yes.

Q. And what did he do then?

A. He bent me over, and he entered me from the back.

Q. When you said he 'entered you from the back'—I'm sorry I have to ask—where did he put his penis?

A. In my vagina.

Q. And at this point, he still had the gun; is that correct?

A. Yes.

Q. Do you know if he ejaculated during any of that, [S.M.]?

A. I think that he did. I'm not sure he—when—he finished whatever he was doing.

* * *

Q. You said he finished. When he was done sexually assaulting you, what did he do next?

A. Grabbed my arm and took me [downstairs] and yelled to the other guys that I [gave] good head."

¶ 10    S.M. stated that her house "was disheveled, disarrayed, stuff thrown all over the place like they had been tossing it and searching it for stuff." She stated that as the men were busy robbing her house, she "started making [her] way to the door. *** I heard someone yell, 'bitch, where you think you're going?' And I opened the door, and I heard a shot at the same time. And I just ran buck-naked down the street." S.M. ran to a tire shop for help. An individual at the shop called the police, and an ambulance took S.M. to a hospital.

¶ 11    Officer Ronald Howard of the Springfield Police Department testified that he was dispatched to the tire shop because "there was a hysterical female in the road that was nude and stating she had been robbed and raped." Howard stated that when he arrived at the shop, he spoke with S.M. who was naked and distraught. Howard "requested an ambulance to respond immediately" because S.M. had "a cut on her left cheekbone and swelling to her face."

¶ 12    Howard followed the ambulance and spoke to S.M. while she was at the hospital. Howard testified that S.M. told him that she had been sexually assaulted and robbed. Howard's testimony about what S.M. told him was consistent with her testimony at trial.

¶ 13    James Cordery, a Springfield police officer, testified that he went to S.M.'s residence on November 22, 2014, and noticed an apparent bullet hole in the frame of the front door. Cordery stated that the residence had been ransacked.

¶ 14    Nurse Rachel Westbrook testified that she administered a sexual assault examination on S.M. at St. John's Hospital. S.M. had told Westbrook that she had been orally and vaginally assaulted. Westbrook noted that S.M. had bruising and swelling on her face.

¶ 15    Dana Pitchford, a forensic scientist with the Illinois State Police, testified that she obtained semen from S.M.'s vaginal swab. Rhonda Carter, also a forensic scientist with the Illinois State Police, testified that two profiles were present on the vaginal swab: (1) a sample contributed by S.M.'s husband and (2) a sample that was a partial match to defendant. Carter elaborated that defendant could not be excluded as having contributed to this second profile, and that only 1 in 49 quadrillion African-Americans, 1 in 31 quadrillion Caucasians, and 1 in 190 quadrillion Hispanics could likewise not be excluded.

¶ 16    Springfield police officer Ryan Leach testified that in December 2014, he discovered Delvin Woodson in possession of property stolen from S.M.'s residence. Springfield police

- 3 -

officer Ryan Sims testified that he showed S.M. a photo lineup and that she was able to identify Woodson as the unmasked man who had ransacked her house. Sims noted that S.M. was unable to identify defendant from a photo lineup.

¶ 17    Woodson testified pursuant to a cooperation agreement with the State and admitted that he was one of the men who broke into S.M.'s residence and ransacked it, along with defendant and Dayion Shaw. Woodson stated that defendant hit S.M. with a gun. Woodson was later loading electronic equipment into a car outside of the residence when he heard a gunshot. Defendant, Shaw, and Woodson then got into the car and left the residence.

¶ 18    Shaw, the third man who broke into S.M.'s residence, testified that defendant hit S.M. with a gun. Shaw stated that as he was removing items from the house, he heard a gunshot. Shaw then got into the vehicle with Woodson, and once defendant joined them, they drove away. Shaw acknowledged that he had pleaded guilty to residential burglary and theft for his role in this incident and had served time in the Department of Juvenile Justice.

¶ 19    Dominic Sparks, a control room operator at the Sangamon County jail, stated that he had a conversation with defendant at the jail. Sparks testified that defendant "had said that 'he raped that girl, so what?' And I proceeded to explain then how there's no pride in an act like that. And as I'm explaining that, he's speaking over me, [saying] 'I don't care. I don't care. I don't care. I don't care.' "

¶ 20    After defendant rested without presenting any evidence, the jury found defendant guilty of all the charges against him.

¶ 21                              D. The Sentencing Hearing

¶ 22    In November 2016, the trial court conducted a sentencing hearing.

¶ 23    Regarding defendant's sentencing range, the parties agreed—both before the trial court and this court—that his minimum sentence would be 63 years and his maximum sentence could exceed 100 years.

¶ 24                              1. *The Parties' Arguments*

¶ 25    The State argued there were no factors in mitigation. 730 ILCS 5/5-5-3.1 (West 2014). The State further argued that several factors in aggravation applied, including (1) the serious harm defendant caused and (2) his juvenile convictions for residential burglary and possession of a firearm with a defaced serial number. *Id.* § 5-5-3.2(a)(1), (3). The State also quoted from S.M.'s victim impact statement in which she said that all of her "good memories in that home are gone, replaced with fear and memories of violence. I cannot and will not ever be able to go back and live there, all because [of] the defendant." The State recommended that the court sentence defendant to 90 years in prison, arguing in support as follows:

> "Your [H]onor, this defendant is a violent, dangerous individual who needs to be locked up for a very long time. Words cannot describe the fear that [S.M.] must have felt as she was in her house as she was violently sexually assaulted at gunpoint by this defendant. Then as she *** runs out of her house *** [defendant] tries to kill her. He shoots head high through part of the door and the door frame as she runs out of the house for her life ***. *** The State will be asking the Court to sentence the defendant to 90 years in the Department of Corrections. That is the appropriate sentence."

¶ 26    Defense counsel requested a 63-year sentence, noting that defendant had no criminal convictions as an adult and was 18 years old at the time of the offense. Defense counsel also argued that defendant's history of mental health problems was a mitigating factor. *Id.* § 5-5-3.1(a)(4). Finally, counsel pleaded for mercy and leniency because the 63-year minimum sentence was already severe.

¶ 27    Defendant's statement in allocution contained a rather limited apology, as follows:

> "I just want to apologize to my family and my loved ones. I know how much I appreciate them supporting me. I just ask that you all have leniency on me, things that happened, and forgive me, I mean for the people that I associate myself with, and I want to apologize to my family, my daughter. That's it."

¶ 28                    2. *The Trial Court's Sentence*

¶ 29    The trial court first noted that it had considered the information contained in the presentence investigation report, the evidence adduced at trial, the financial impact of incarceration, "the applicable factors in aggravation and mitigation," and S.M.'s victim impact statement. The court then accepted the State's sentencing recommendation, explaining as follows:

> "[L]ast year when this crime was committed, Mr. Wheeler, I cannot lose sight of the utter hell you inflicted upon this woman's life, and as she is attempting to flee this hell you placed on her life that day, she has that small opportunity to flee that hell, you shoot at her. *** [Y]our actions on that day speak of a despicable human being ***. *** [A] message has to be sent to the public that we're going to protect [them] from you and from your callous actions ***. So I concur with the State with respect to their sentencing recommendations, and I will adopt those recommendations as offered by the State."

¶ 30    Accordingly, the trial court sentenced defendant to 30 years for home invasion, 30 years for aggravated criminal sexual assault (penis to vagina), and 30 years for aggravated criminal sexual assault (penis to mouth) and ordered the sentences to be served consecutively. The court also sentenced defendant to 10 years for residential burglary, 5 years for theft of property exceeding $500 in value, 5 years for aggravated battery, 5 years for aggravated unlawful restraint, and 3 years for aggravated unlawful use of a weapon, but the court ordered those sentences to be served concurrently.

¶ 31    This appeal followed.

¶ 32                              II. ANALYSIS

¶ 33    Defendant appeals, arguing that the trial court's imposition of an aggregate 90-year prison sentence (1) was an abuse of discretion, (2) cannot be justified on the basis of rehabilitation, and (3) is not necessary for the protection of the public because the State "offered to accept a plea in exchange for a 38-year sentence." We address these issues in turn.

¶ 34                    A. Sentencing Considerations

¶ 35    Defendant first argues that the trial court's "excessive *de facto* natural life sentence was an abuse of discretion." We disagree.

¶ 36                                    1. *The Applicable Law*

¶ 37        "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Criminal punishment serves four key purposes: (1) retribution, (2) deterrence, (3) incapacitation, and (4) rehabilitation. *Graham v. Florida*, 560 U.S. 48, 71 (2010); see 1 Wayne R. LaFave, Substantive Criminal Law § 1.5(a) (3d ed. 2017). Which of these purposes predominates in a given case is a matter left to the sound discretion of the trial court.

¶ 38        The Unified Code of Corrections (Unified Code) (730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2014)) sets forth mitigating and aggravating factors that the trial court must consider when determining an appropriate sentence. *People v. Brunner*, 2012 IL App (4th) 100708, ¶¶ 43-45, 976 N.E.2d 27. "Nonetheless, the seriousness of the offense, rather than any mitigating evidence, is the most important factor in sentencing." *People v. Foxx*, 2018 IL App (1st) 162345, ¶ 50. A reviewing court will presume that the trial court considered all relevant factors and any mitigating evidence presented (*People v. Jackson*, 2014 IL App (1st) 123258, ¶ 48, 23 N.E.3d 430) and may not substitute its judgment for that of the trial court merely because it would have weighed these factors differently. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11, 65 N.E.3d 419. A sentence within the statutory guidelines provided by the legislature is presumed to be proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46, 19 N.E.3d 1070.

¶ 39        "The sentence imposed by the trial court is entitled to great deference and will not be reversed on appeal absent an abuse of discretion." *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 38, 92 N.E.3d 494. "The trial court's imposition of a sentence is given great deference because the trial court is in the best position to consider the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 15, 82 N.E.3d 693. The trial court abuses its discretion at sentencing only when the sentence varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Mischke*, 2018 IL App (2d) 160472, ¶ 14, 109 N.E.3d 366.

¶ 40                                        2. *This Case*

¶ 41        We first note that, as earlier discussed, the parties agree—both before the trial court and this court—that defendant's permissible prison sentence ranged from 63 years to over 100 years. Because the trial court's 90-year sentence was within the statutory range provided by the legislature, we presume that defendant's sentence is proper. *Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 42        Second, the aggravating factors set forth in the Unified Code support the trial court's imposition of an aggregate 90-year sentence. The trial court stated that it considered "all the applicable factors in aggravation and mitigation." The Unified Code provides that causing or threatening serious harm is an aggravating factor. 730 ILCS 5/5-5-3.2(a)(1) (West 2014). Likewise, a defendant's prior criminal history is an aggravating factor. *Id.* § 5-5-3.2(a)(3). Due to defendant's egregious criminal conduct in this case and his prior criminal history, several aggravating factors were present when the trial court sentenced defendant. *Id.* § 5-5-3.2(a)(1), (3).

¶ 43        In arguing for the presence of a mitigating factor, defendant notes that he had been hospitalized for depression and had been prescribed medications for depression and anxiety.

Thus, he argues to this court that his history of mental health problems "should also be considered in mitigation." We are unpersuaded.

¶ 44 Certainly, the trial court *could have* considered defendant's depression as a mitigating factor. See *id.* § 5-5-3.1(a)(4). However, a defendant's mental or psychological impairments are not inherently mitigating. *People v. Tenner*, 175 Ill. 2d 372, 382, 677 N.E.2d 859, 864 (1997). To this point, the Illinois Supreme Court has reasoned as follows:

> "[T]his court has repeatedly held that 'information about a defendant's mental or psychological impairments is not inherently mitigating.' [Citation.] As we explained in *Tenner*, '[a]t sentencing, a judge or jury considering evidence of this nature might view the information as either mitigating or aggravating, depending, of course, on whether the individual hearing the evidence finds that it evokes compassion or demonstrates possible future dangerousness.' [Citation.]" *People v. Madej*, 177 Ill. 2d 116, 139, 685 N.E.2d 908, 920 (1997).

¶ 45 Third, the trial court's sentence did not violate the spirit and purpose of the law nor was it manifestly disproportionate to the nature of the offense. *Mischke*, 2018 IL App (2d) 160472, ¶ 14. Defendant robbed, assaulted, brutally raped, and discharged a firearm at S.M. She will likely bear these scars, both physical and emotional, for the rest of her life. Due to defendant's egregious conduct, we conclude that the trial court's imposition of an aggregate 90-year sentence was entirely appropriate. Some crimes are so abhorrent that the defendant who committed them forever forfeits his right to walk among civilized society as a free man. No person should ever have to suffer the modern urban nightmare that S.M. endured at the hands of this defendant.

¶ 46                               B. Defendant's Rehabilitation Argument

¶ 47 Additionally, we reject defendant's argument that the trial court's decision to sentence him "to a 90-year aggregate term cannot be justified on the basis of rehabilitation." That contention may be correct, but it is entirely beside the point. We earlier noted that "penalties shall be determined *both* according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Emphasis added.) Ill. Const. 1970, art. I, § 11. We also noted earlier that in addition to rehabilitation, criminal punishment also serves the goals of (1) retribution, (2) deterrence, and (3) incapacitation. *Graham*, 560 U.S. at 71. The trial court could have reasonably concluded that the viciousness of the multiple felonies defendant committed required his incapacitation and that this factor (under the circumstances of this case) greatly predominates over concerns about defendant's rehabilitation potential.

¶ 48 We already noted no person should ever have to suffer what the victim in this case suffered, and the only way to ensure this goal is to put defendant in prison for the rest of his life. To be blunt, his incapacitation—namely, his lengthy prison sentence—means that while he is *there*, he cannot be doing it *here*. Accordingly, the trial court's sentence need not be "justified on the basis of rehabilitation."

¶ 49                        C. The State's Proffered Plea Agreement Is Irrelevant
                              When a Defendant Is Sentenced After Trial

¶ 50 Last, defendant argues that his sentence is not necessary for the protection of the public because "[i]f the State thought that a life sentence was necessary to protect the public, it would

not have offered to accept a plea in exchange for a 38-year sentence." We conclude that the State's offer during plea negotiations is an improper basis upon which to attack the length of a criminal sentence imposed after trial.

¶ 51 "State's Attorneys have always enjoyed wide discretion in the initiation and management of criminal cases." *People v. Hubbard*, 2012 IL App (2d) 120060, ¶ 23, 978 N.E.2d 719. "Plea bargaining is an important and, perhaps, the central component of our criminal justice system." *People v. White*, 2011 IL 109616, ¶ 35, 953 N.E.2d 398 (Theis, J., specially concurring). "Plea bargaining leads to prompt disposition of cases, preserves finite judicial and financial resources, and allows the State to focus its prosecutorial efforts where they are most needed." *People v. Donelson*, 2013 IL 113603, ¶ 18, 989 N.E.2d 1101. Further, the possibility of reduced sentencing pursuant to a plea agreement "is the driving force behind the plea bargaining process." *White*, 2011 IL 109616, ¶ 37 (Theis, J., specially concurring). To this point, the United States Supreme Court has explained as follows:

> "[B]oth the State and the defendant often find it advantageous to preclude the possibility of the maximum penalty authorized by law. For a defendant who sees slight possibility of acquittal, the advantages of pleading guilty and limiting the probable penalty are obvious—his exposure is reduced, the correctional processes can begin immediately, and the practical burdens of a trial are eliminated. For the State there are also advantages—the more promptly imposed punishment after an admission of guilt may more effectively attain the objectives of punishment; and with the avoidance of trial, scarce judicial and prosecutorial resources are conserved for those cases in which there is a substantial issue of the defendant's guilt or in which there is substantial doubt that the State can sustain its burden of proof. It is this mutuality of advantage that perhaps explains the fact that at present [(1970)] well over three-fourths of the criminal convictions in this country rest on pleas of guilty, *a great many of them no doubt motivated at least in part by the hope or assurance of a lesser penalty than might be imposed if there were a guilty verdict after a trial to judge or jury*." (Emphasis added.) *Brady v. United States*, 397 U.S. 742, 752 (1970).

¶ 52 The State could have had various reasons why it was willing to offer defendant a 38-year sentence. For example, perhaps S.M. was reluctant to testify at trial due to the trauma of her attack and the difficulty and unpleasantness of her needing to recount it publicly in a courtroom full of strangers. See Marc L. Miller & Ronald F. Wright, *The Black Box*, 94 Iowa L. Rev. 125, 146-47 (2008) (a victim's refusal to cooperate has an empirically measurable effect on whether a prosecutor declines to pursue rape and other sexual assault charges). Likewise, perhaps the State, in the exercise of its discretion, offered defendant a 38-year sentence to efficiently bring this case to a close. See Frank H. Easterbrook, *Criminal Procedure as a Market System*, 12 J. Legal Stud. 289, 308-09 (1983) (arguing that plea bargaining is an efficient and desirable process for both the State and the defendant). Regardless, it was entirely appropriate for the State to first offer a 38-year sentence during plea negotiations and then to later request a 90-year sentence following defendant's conviction at trial. *Brady*, 397 U.S. at 752.

¶ 53                                            III. CONCLUSION

¶ 54 For the reasons stated, we affirm defendant's convictions and sentences. As a part of our judgment, we award the State its $50 statutory assessment against defendant as costs of this

appeal. 55 ILCS 5/4-2002(a) (West 2016).

¶ 55          Affirmed.