NOTICE
Decision filed 01/07/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 230920-U

NO. 5-23-0920

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 22-CF-336 |
| | ) | |
| TREYAVEON D. MASSIE, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Hackett concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's 80-year sentence for first degree murder is affirmed where the sentence was not excessive.

¶ 2    Defendant, Treyaveon D. Massie, appeals, arguing that the trial court's sentence was excessive. For the following reasons, we affirm defendant's sentence.

¶ 3                    I. BACKGROUND

¶ 4    On September 30, 2022, defendant was charged, by information, with three counts of first degree murder, in violation of section 9-1(a)(1) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(1) (West 2022)) stemming from the death of Cadias Jackson on September 29, 2022. All three counts requested a sentence enhancement of 25 years to natural life if defendant was found accountable for personally discharging the firearm that killed Cadias.

1

¶ 5 Defendant's trial was held from March 7, 2023, to March 10, 2023. The following evidence was provided at trial. Defendant's girlfriend, Chelse Padgett, testified that she lived in Evansville, Indiana, with defendant, her two children, and her mother, Retha. Chelse explained that Retha moved out of Chelse's house in July 2022, at which time Retha moved in with Cadias. Retha lived with Cadias for approximately three months and then returned to live with Chelse.

¶ 6 Chelse stated that on September 29, 2022, Retha was worried that she was not going to get her personal belongings back from Cadias. Cadias wanted his dog back. Defendant, while holding Retha's gun in Chelse's apartment, stated he would "pop" Cadias if Retha did not get her property. He then put the gun in his pocket. Shortly thereafter, Chelse, her two children, Retha, and defendant got into Retha's van and drove to Mt. Vernon. After stopping to pick up Retha's check and cashing it at Kroger, the group headed to Cadias's house.

¶ 7 When they arrived, Cadias was sitting on his lawnmower. Defendant and Retha exited the vehicle and defendant walked to the back of the van to open the hatch. He left the hatch open and then headed toward Retha and Cadias. On the way toward them, defendant pulled a gun out of his pocket and shot Cadias four or five times. Defendant and Retha hurried back to the van, closed the hatch, entered the vehicle, and drove off. A neighbor's surveillance system recorded the entire incident, and a different neighbor witnessed part of the incident and called 911.

¶ 8 Retha's van was pulled over by law enforcement approximately five minutes after the shooting. The gun was found in the glove box. The magazine was found in the center console. Each of the adults provided less than truthful statements regarding the murder and all were criminally charged. Chelse later admitted lying to police and testified consistently with the video at trial. She revealed that she initially lied to police because she was scared and nervous since the incident involved her mother and the father of her children.

2

¶ 9    Additional testimony and evidence obtained from law enforcement personnel, forensic scientists, and the autopsy prosector revealed that Cadias's death was due to multiple gunshots to the chest and abdomen, the bullets retrieved from Cadias's body came from the weapon found in Retha's van, and both of defendant's hands tested positive for gunshot residue. The pathology report also indicated that Cadias had an ethanol level above the legal limit and THC in his system. Law enforcement addressed multiple fallacies provided by defendant during his police interview ranging from claims that he did not know Cadias and was never at Cadias's residence to Cadias threatening defendant and his family while they sat inside the van at Cadias's residence. Defendant's statements regarding the weapon were equally evolving during the interview.

¶ 10    Defendant claimed self-defense at trial. Defendant testified that when he saw Cadias move his hands toward the pocket of his hoodie, he believed Cadias had a weapon and so he shot him. He also testified that Cadias was drunk, aggressive, and angry, and his eyes were bloodshot. Defendant stated that Retha had the gun in her purse in the car and disagreed with Chelse's testimony that defendant said he would "pop" Cadias before they left the house. Defendant eventually admitted that he took Retha's gun from her purse when he exited the van. He agreed that he never saw Cadias with a firearm, but he shot at him because Cadias was acting like he had a gun. Defendant repeatedly disagreed with the video of the shooting. Following defendant's testimony, defense counsel submitted a bill of indictment against Cadias for aggravated domestic battery along with a 24-month probation sentence for that crime. Thereafter, the defense rested.

¶ 11    Jury instructions were addressed, defendant and defense counsel confirmed that no instruction for the offense of second degree murder was requested, closing arguments were presented, and the case was given to the jury at 3:25 p.m. A verdict was reached 17 minutes later,

finding defendant guilty of first degree murder. The jury also found that defendant personally discharged the firearm that proximately caused Cadias's death.

¶ 12    Defendant filed a motion for a new trial alleging that insufficient evidence supported the verdict. It further alleged the court erred in its consideration of evidentiary issues during the trial. A presentencing investigation report (PSI) was filed on May 11, 2023. Three juvenile matters involving battery, possession of a controlled substance, and possession of a dangerous weapon at school were listed as defendant's prior felonies. He also had three adult misdemeanor charges, which included two counts of obstructing an officer and one count of disorderly conduct. Defendant was sentenced to probation on the misdemeanors, but probation was later revoked.

¶ 13    Defendant's sentencing hearing was held on June 29, 2023. The court first addressed defendant's motion for a new trial and denied the motion. The court averred that the conviction carried a sentencing range of 20 to 60 years on the murder charge with a mandatory 25-year to life sentence enhancement due to the jury finding that defendant committed the murder with a firearm. Defense counsel advised the court that defendant's prior juvenile matters were misdemeanors and the State agreed. The State submitted updated records clarifying the juvenile matters. Defense counsel objected to the incident reports included in the State's exhibit, but the objection was overruled and the exhibit was admitted. The State also submitted additional information regarding the adult misdemeanors from 2016. Defense counsel objected to a handwritten document and a police incident report on the basis of hearsay. The trial court sustained the objection as to the handwritten document but admitted the remainder of the exhibit. A victim impact statement was provided by Cadias's brother, Malcolm. Malcolm requested the maximum sentence available because the death was unnecessary and destroyed the family. Defense counsel submitted a character letter from defendant's mother as evidence in mitigation.

4

¶ 14    The State argued aggravating factors that included defendant's criminal history and necessity to deter similar actions. It further argued that defendant's attitude toward society and falsehood during testifying at trial undermined defendant's rehabilitative potential. The State asked for life imprisonment, more specifically requesting 60 years on the first degree murder conviction and 35 years on the firearm enhancement, for a total of 95 years.

¶ 15    Defense counsel argued mitigating factors, including substantial grounds tending to excuse or justify defendant's conduct and that defendant's conduct was induced or facilitated by someone other than defendant, named Retha McIntire. Defense counsel also asked the court to consider nonstatutory factors including defendant being 24 years of age with hope of rehabilitation. Counsel requested a minimum sentence of 20 years for the murder conviction and 25 years for the firearm enhancement for a total of 45 years. Following argument, defendant provided a statement in allocution that included an apology and a request for forgiveness. He also disputed being a "cold-blooded killer."

¶ 16    The trial court addressed the factors in aggravation and mitigation. It agreed with the State as to defendant's prior criminal history but stated it would not give the history much weight. It also agreed with the State's argument regarding deterrence. The court disagreed with defense counsel's argument for substantial grounds tending to excuse defendant's conduct. It noted that the jury found no basis for the claim of self-defense, and neither did the court, stating, "it didn't look to me like [there were] *** any reasonable grounds for self-defense or anything that would justify the killing, the shooting down of Mr. Jackson." The court did believe a finding of inducement could be made as to Retha having the gun in her purse, bringing it along, driving everyone to Cadias's home, and driving everyone away to try to escape. However, it did not think the inducement let defendant "off the hook here by any means."

5

¶ 17    Starting with the murder sentence, the court found that they were "not at the minimum sentence *** by any means." It stated that defendant "was very cool and collected and was obfuscating, lying to the police about what happened." The court found defendant's behavior contrary to the actions of someone who shot another in self-defense. The court also noted that defendant took the gun from Retha's purse, "concealed it, and walked up, and *** immediately shot Mr. Jackson dead within multiple gunshots and then fled the scene." It also noted defendant's statement in Evansville that he was "going to pop" Cadias. The court noted that the incident "was almost like an execution." Cadias asked about his dog and "immediately after that, he was shot dead." The court also found it relevant that the dispute was "over nothing, really" only "some personal property and a dog." The court found itself at the mid-range for the murder and sentenced defendant to 40 years for first degree murder. It then sentenced defendant to 40 additional years as a sentence enhancement for discharging the weapon that killed Cadias. The total sentence was 80 years to be served at 100% with 3 years' mandatory supervised release.

¶ 18    Defendant moved for reconsideration of his sentence arguing that the 80-year sentence was excessive because the court (1) failed to properly apply mitigation factors, (2) improperly applied aggravation factors, and (3) and erred in overruling defendant's objection as to the State's evidence. The trial court denied the motion to reconsider on October 12, 2023. Defendant timely appealed.

¶ 19                              II. ANALYSIS

¶ 20    On appeal, defendant argues that the trial court's 80-year sentence was excessive because it did not adequately consider defendant's relative youth and potential for rehabilitation. He argues that the facts in this case do not necessitate an 80-year sentence, and a 45-year minimum sentence would be appropriate when addressing both the seriousness of the offense and the objection of

6

restoring defendant to useful citizenship. We review the trial court's sentence for an abuse of discretion. *People v. Etherton*, 2017 IL App (5th) 140427, ¶¶ 15, 21. An abuse of discretion occurs when the sentence differs greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Snyder*, 2011 IL 111382, ¶ 36.

¶ 21    The trial court's sentence is given great deference (*People v. Alexander*, 239 Ill. 2d 205, 212 (2010)) because it is in the best position to consider "defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). In determining what sentence to impose, the trial court considers the circumstances of the offense, the characteristics of the defendant, and the applicable sentencing factors. *People v. Palmer*, 162 Ill. 2d 465, 484 (1994). The trial court is not required to articulate every statutory factor at the sentencing hearing (*Etherton*, 2017 IL App (5th) 140427, ¶ 29) and we presume the court considered all the relevant factors when it pronounced its sentence. *People v. Wheeler*, 2019 IL App (4th) 160937, ¶ 38 (citing *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 48). While numerous statutory and nonstatutory factors may be considered, it is the seriousness of the crime that is the most important factor in determining the appropriate sentence. *Etherton*, 2017 IL App (5th) 140427, ¶ 28. When the imposed sentence falls within the statutory limits, it will be overturned only if the sentence imposed is " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Alexander*, 239 Ill. 2d at 212 (quoting *Stacey*, 193 Ill. 2d at 210).

¶ 22    In the present case, the jury convicted defendant of first degree murder and further found that he was responsible for discharge of the firearm used to kill the victim. The trial court correctly enunciated the sentence range of 20 to 60 years' imprisonment for first degree murder (see 730 ILCS 5/5-4.5-20(a) (West 2022)) as well as the mandatory sentence enhancement ranging from 25

years to life (see *id.* § 5-8-1(a)(1)(d)(iii)). Accordingly, no argument can be raised that defendant's sentence did not fall within the statutory limits.

¶ 23    Defendant argues, citing *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002), that the trial court must consider all factors in aggravation and mitigation and failed to consider defendant's law-abiding nature prior to the offense, his employment, his family ties, and his young age as they relate to his potential rehabilitation. We do not quibble with *Quintana*'s directive.

¶ 24    Instead, we note that the facts argued on appeal were before the trial court at the time of sentencing. Information related to defendant's juvenile and adult crimes that revealed defendant was a law-abiding citizen for approximately three years before he shot Cadias was in the PSI, along with the State's Exhibits 1 and 2. Similarly, defendant's part-time employment at the time of the crime was included in the PSI along with employment history consisting of one month at a bread factory, a few months at Taylor Made, six to eight months at Golden Corral, and a year at Escalade sports before "he was let go for being disrespectful." Defendant's familial relationships, including his parents, siblings, girlfriend, and children, were also set forth in the PSI, and defense counsel argued that there was "hope" for defendant given his current age of 24 at the time of sentencing.

¶ 25    While the trial court did not specifically mention these factors at the sentencing hearing, the trial court is not required to address every factor in aggravation and mitigation or assign some value to them. *Etherton*, 2017 IL App (5th) 140427, ¶ 29. Further, defendant points to nothing that would overcome the presumption that the trial court considered that evidence (see *id.*) and found it did not support defendant's alleged rehabilitative potential. While defendant remained a law-abiding citizen for three years in between crimes, he presented no authority that a gap of that duration shows mitigation when defendant's criminal history revealed a pattern of committing a crime every three or four years. Further, defendant's sporadic employment, along with one

8

employer that terminated his employment for being disrespectful, does not provide much support for defendant's rehabilitative potential either.

¶ 26     While defendant's parentage of two young children is important and would potentially be a strong consideration for rehabilitation, the argument loses muster when the evidence confirms that defendant brought his children to witness him shooting and killing their grandmother's unarmed ex-boyfriend in broad daylight. Clearly becoming a parent neither prohibited nor swayed defendant from committing a crime. Relevant here, defendant committed a substantially more dangerous crime after having children than the ones he committed prior to having children.

¶ 27     Finally, while Illinois "led the nation" in forming juvenile courts and, "traditionally, as a society *** recognized that young defendants have greater rehabilitative potential" (*People v. Miller*, 202 Ill. 2d 328, 341-42 (2002)), the court's statements were specifically geared toward juveniles and acknowledged the difference between the law of nature and the laws that govern society. *Id.* at 342. Defendant was neither a juvenile at sentencing nor when the crime was committed, and therefore *Miller v. Alabama*'s consideration of "youth" requirement is inapplicable. See *People v. Harris*, 2018 IL 121932, ¶ 61 ("claims for extending *Miller* [*v. Alabama*, 567 U.S. 460 (2012)] to offenders 18 years of age or older have been repeatedly rejected").

¶ 28     We also consider defendant's reliance on *People v. Maggette*, 195 Ill. 2d 336 (2001). In *Maggette*, the Illinois Supreme Court reduced defendant's 10-year residential burglary sentence to 5 years after acknowledging defendant's "appalling and harmful" behavior but finding the behavior was not severe enough to warrant the 10-year sentence. While the State argues *Maggette* is an "outlier," it is not our place to question the court's wisdom in reducing defendant's sentence. We note, however, that nothing in *Maggette* suggests that a sentence reduction is required in every

9

case. Further, the defendant's actions in *Maggette* were intrusive but not violent. See *People v. McGowan*, 2013 IL App (2d) 111083, ¶ 15. The same cannot be said about the act in this case where defendant shot the victim at least four times.

¶ 29     A reviewing court's authority to reduce a sentence is well-established. See Ill. S. Ct. R. 615(b)(4) (eff. Jan. 1, 1967); *People v. Perruquet*, 68 Ill. 2d 149, 153-54 (1977); *People v. O'Neal*, 125 Ill. 2d 291, 297-98 (1988); *People v. Jones*, 168 Ill. 2d 367, 378 (1995); *People v. Webster*, 2023 IL 128428, ¶ 32. The authority to reduce a sentence requires either a finding of error or that the trial court abused its discretion. *Webster*, 2023 IL 128428, ¶ 32.

¶ 30     Here, we find neither. The trial court noted coldness in defendant's demeanor, both at the time of the killing and after his arrest. It considered defendant's statement that he would "pop" Cadias before they left Evansville. The court further noted that defendant removed the weapon from Retha's purse before exiting the vehicle, failed to even try to communicate with Cadias before shooting him, and the time between defendant's exit from the vehicle and shooting Cadias was incredibly short. The court found defendant's actions at Cadias's residence were similar to "an execution." The court further noted that the basis of the dispute did not even involve defendant and merely involved the return and exchange of Retha's property and Cadias's dog. Given the facts and evidence in this case, the trial court's evaluation of the factors in aggravation and mitigation, review of the PSI, the victim impact statement, defendant's statement in allocution, and character letter from defendant's mother, we can find no error of law or abuse of discretion in either the court's 40-year sentence for first degree murder or the 40-year mandatory firearm sentence enhancement. Accordingly, we affirm the trial court's sentence.

¶ 31                                    III. CONCLUSION

¶ 32    For the above-stated reasons, we affirm defendant's 80-year sentence imposed by the trial

court.


¶ 33    Affirmed.