NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230087-U

NO. 4-23-0087

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 6, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Logan County |
| RYANN N. JOHNSON, | ) | No. 18CF200 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas W. Funk, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice DeArmond and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant forfeited his argument that the trial court considered improper
aggravating factors when sentencing him to 10 years' imprisonment for
aggravated domestic battery.

¶ 2    Defendant, Ryann N. Johnson, appeals the trial court's judgment sentencing him

to ten years' imprisonment for aggravated domestic battery. On appeal, defendant argues the

court improperly considered two factors in aggravation: (1) an element inherent in the offense

and (2) that he held a position of trust in relation to the victim. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4                                          A. The Charges

¶ 5    On October 23, 2018, the State charged defendant by information with two counts

of home invasion (720 ILCS 5/19-6(a)(2) (West 2018)) (counts I and II), two counts of criminal

sexual assault (*id.* § 11-1.20(a)(1)) (counts III and IV), and one count of aggravated domestic battery (*id.* § 12-3.3(a-5)) (count V). We note that a jury acquitted defendant of counts I through IV, and we therefore discuss the facts related to those offenses only as necessary to resolve the issue raised on appeal. In count V, the State alleged that on October 21, 2018, defendant, in committing a domestic battery, "knowingly strangled Lacey S., a family or household member." The State further indicated in count V that defendant was eligible for extended-term sentencing pursuant to section 5-5-3.2(b)(1) of the Unified Code of Corrections (Corrections Code) (730 ILCS 5/5-5-3.2(b)(1) (West 2018)) and faced a potential sentencing range of 7 to 14 years' imprisonment if convicted.

¶ 6                      B. The State's Pretrial Motion to
                        Introduce Other-Crimes Evidence

¶ 7            On April 24, 2019, the State filed a pretrial motion pursuant to section 115-7.4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.4 (West 2018)), seeking to introduce evidence of defendant's other crimes. Specifically, the State sought to introduce evidence from Logan County case Nos. 14-CF-85 and 15-CF-68, in which, respectively, defendant pleaded guilty to the aggravated domestic battery of Bianca R. and the domestic battery of Lacey S.. The trial court granted the State's motion.

¶ 8                              C. The Jury Trial

¶ 9            Defendant's jury trial commenced on July 18, 2022, and concluded on July 21, 2022.

¶ 10                            1. *Robert Sherren*

¶ 11           Robert Sherren, a sergeant with the Lincoln Police Department, testified that he was dispatched to Lacey S.'s residence at approximately 3:20 p.m. on October 21, 2018. Sherren briefly spoke with Lacey S. and testified she appeared "emotionally disturbed and upset."

According to Sherren, Lacey S. "was crying, her face was red, and she was just—you could just tell she was distraught." Sherren testified that he observed red marks on her neck and arms. Lacey S. was then transported to the hospital by ambulance.

¶ 12                                    2. *Lacey S.*

¶ 13          Lacey S. testified that she began dating defendant in 2015 and shared a six-year-old daughter with him. Lacey S. testified that on October 21, 2018, she was at her home and defendant was repeatedly texting her asking to see their child, who was in her bedroom. Defendant stopped texting Lacey S. at approximately 1:30 p.m., and she went back to watching TV. Shortly thereafter, Lacey S. heard footsteps coming down the hallway behind her. Lacey S. testified that defendant entered the living room, "came towards [her] pretty quickly," grabbed her cell phone, and began reading her text messages. When Lacey S. attempted to take her phone back from defendant, he grabbed her by the hair and threw her onto the floor. Defendant then sat on Lacey S. chest and pinned her arms to the ground while he continued to read her messages and accused her of cheating on him.

¶ 14          After slamming her head against the floor several times, defendant told Lacey S. to go to her bedroom. Once in the bedroom, defendant shoved her onto the bed and told her to take her pants down or else he would "slit" her throat. Lacey S. complied with defendant's demand, and defendant digitally penetrated her for approximately 15 seconds. Defendant allowed Lacey S. to sit up at the end of the bed and asked her how long she had been seeing the man she was texting. Lacey S. stated she had not been seeing him for very long, at which point defendant "grabbed [her] by the neck, pushed [her] back on the bed, and started to strangle [her]." Lacey S. elaborated as follows:

"Q. When you say, put you back on the bed, where were you located on the bed?

A. I was sitting at the end of the bed.

Q. And then he put his hands on you?

A. Yes.

Q. Do you recall which hands [*sic*]?

A. It was his right hand.

Q. And where did he put it on your body?

\* \* \*

A. On my neck.

\* \* \*

Q. Did he apply any pressure to your neck?

A. He did.

Q. And what happened when he applied that pressure to your neck?

A. I started to see black spots.

Q. How long did he hold your neck?

A. Ten—maybe ten seconds.

Q. [Were] you able to breathe?

A. No.

Q. Was blood able to go to your head?

A. It felt like my eyes were going to pop out.

Q. How hard was he squeezing?

A. Extremely hard.

Q. Was he saying anything to you when he was squeezing your neck?

A. He just continued to accuse me and asked me why I was telling everybody that we weren't together.

Q. After he held you by the neck, what happened?

A. He let go and backed up, and I was able to sit up.

Q. What happened—and were you sitting on the bed at that time?

A. Yes.

Q. What happened after you sat up?

A. He asked me more questions, and then he attacked me again—or he pushed me back down on the bed by my neck.

Q. And what happened when he pushed you back down by your neck?

A. He choked me again.

Q. How long did he have his hands on your neck that time?

A. Fifteen or twenty seconds.

Q. How hard was he squeezing you that time?

A. Extremely hard.

Q. Did you ever lose consciousness?

A. I just remember seeing a lot of black spots, and he told me he wished he could kill me.

Q. But you never completely blacked out; is that correct?

A. That's correct.

Q. And were you having a hard time breathing then, too?

A. I couldn't breathe."

¶ 15       Lacey S. testified that defendant eventually stopped his assault and began "basically *** having a conversation" with her. Defendant asked Lacey S. repeatedly if she was going to call the police if he left her house. Lacey S. testified that defendant told her he would leave if she agreed to change her phone number and promised not to call the police. Lacey S. called the phone company and had her phone number changed. Defendant then left and Lacey S. called the police. Once the police arrived, Lacey S. was taken to the hospital by ambulance for a physical and sexual examination.

¶ 16       Lacey S. also testified about a separate domestic incident involving defendant that occurred on April 18, 2015. Lacey S. testified she and defendant had attended a wedding together on that date. After the wedding, they went to a hotel and got into an argument. Lacey S. decided to leave the hotel so as not to escalate the argument. Defendant followed her to the parking lot and shoved her into a truck's door handle using two hands. Defendant was arrested and he subsequently pleaded guilty to domestic battery in Logan County case No. 15-CF-68.

¶ 17                            3. *Sumesh Jain*

¶ 18       Sumesh Jain, an emergency medicine physician, testified that he treated Lacey S. at the hospital on October 21, 2018. Jain testified that he observed bruising to both sides of Lacey S.'s neck. According to Jain, Lacey S. "had a history and exam consistent with physical assault and sexual assault."

¶ 19                            4. *Bianca R.*

¶ 20       Bianca R. testified that she had known defendant since 2011. She was previously engaged to him and they shared two children. At approximately 1:30 in the morning on August 15, 2014, Bianca R. received a phone call from an unknown number while in bed. Bianca R. answered the phone and recognized defendant's voice on the other end, so she hung up and went

back to sleep. Approximately one hour later, Bianca R. awoke to defendant "standing over" her and "straddling" her in her bedroom. Bianca R. testified she attempted to grab her phone, but defendant told her it was "already gone." Defendant then pinned Bianca R.'s arms down and told her that they were going to "figure it out." Bianca R. testified that they went outside to talk because there were three small children asleep in the house. When they got outside, Bianca R. "looked at him in the eye and told him, Fuck you." Bianca R. further testified that in response to her statement, defendant "[g]rabbed me by the throat, choked me until I lost consciousness, tossed me around, [and] threw me." Around this time, Bianca R.'s six-month-old child awoke and "needed a bottle." While Bianca R. was attending to the baby in the living room, defendant went into her bedroom and fell asleep. Bianca R. testified that because she could not locate her phone, she contacted a friend using her Kindle. The friend called the police, and the police arrested defendant. Defendant subsequently pleaded guilty to aggravated domestic battery in Logan County case No. 14-CF-85.

¶ 21                                      5. *Defendant*

¶ 22           Defendant testified that on October 21, 2018, he went to Lacey S.'s house uninvited and knocked on her back door. According to defendant, Lacey S. let him into the house, and they conversed in the kitchen for a period of time before moving to the living room to watch TV. After a while, Lacey S. got up to use the restroom. While she was in the bathroom, defendant grabbed her phone and began scrolling through her messages. Defendant testified that he discovered Lacey S. had been messaging another man in a sexual manner and sending him pictures of their child. Defendant began arguing with Lacey S. when she returned to the living room. Defendant testified that Lacey S. slapped him while they were arguing. In response, defendant grabbed her by the hair and threw her to the floor. Once she was on the floor,

defendant "called her a stupid, dirty whore and grabbed her by the neck." Defendant testified that he did, in fact, squeeze and hold Lacey S.'s neck, but he denied sexually assaulting her or entering her home without permission.

¶ 23                                  6. *The Jury Verdict*

¶ 24          The jury subsequently found defendant guilty of aggravated domestic battery and not guilty of the remaining charges.

¶ 25                               D. The Sentencing Hearing

¶ 26          On September 16, 2022, the trial court conducted a sentencing hearing. A presentence investigation report (PSI) was prepared in advance of the hearing. According to the PSI, defendant's criminal history included three misdemeanor convictions and three felony convictions. As noted above, defendant was convicted of the aggravated domestic battery of Bianca R. in Logan County case No. 14-CF-85 and the domestic battery of Lacey S. in Logan County case No. 15-CF-68, both felonies. Defendant committed the latter offense while on probation for the former. The PSI further indicated that defendant's parents divorced when he was two years old, he was diagnosed with attention-deficit/hyperactivity disorder (ADHD) at the age of four, and he had struggled with symptoms of depression and anxiety for most of his life. Defendant began smoking marijuana at the age of 10 and started using additional substances throughout his teens. Defendant described himself as an alcoholic and as being addicted to cocaine.

¶ 27          Defendant provided multiple character letters and Lacey S. submitted a victim impact statement to the court. In the victim impact statement, Lacey S. stated, in relevant part, that her daughter witnessed the "attack" and "had to ride next to me in an ambulance because of [it]." Neither party presented any additional evidence in mitigation or aggravation at the hearing.

¶ 28    The State, after arguing against a sentence of probation and noting defendant faced a sentencing range of 3 to 14 years' imprisonment, asserted the trial court should consider the following statutory factors in aggravation when fashioning its sentence:

"MR. HAUGE: [(STATE'S ATTORNEY)]: On the other hand, there are statutory factors in aggravation that do apply, specifically Subsection 1 of [the Corrections Code (730 ILCS 5/5-5-3.2(a)(1) (West 2022))], that the defendant's conduct caused or threatened serious harm, and that's not just the physical harm that [Lacey S.] suffered, but that's the emotional harm, as well. And you can see that she still carries that with her years and years and years later and will continue to.

Subsection 3, the defendant has a history of prior delinquency or criminal conduct, and he does.

Subsection 7, the sentence is necessary to deter others from committing the same crime. Again, a message needs to be sent that domestic violence towards women, sexual assaults, home invasions, should not be tolerated.

Subsection 12, the defendant was convicted of a felony committed while he was on parole, and that's what we have here, Your Honor. That's a statutory factor in aggravation.

And Subsection 14, the last section that applies is that the defendant held a position of trust or supervision over another, such as a family or household member, and that's what [Lacey S.] is. So there are five statutory factors in aggravation that apply in this case."

The State ultimately recommended a sentence of 13 years' imprisonment. Defendant agreed that a sentence of probation was inappropriate and recommended a sentence of five years' imprisonment.

¶ 29       The trial court found that a sentence of probation was inappropriate given defendant's "long history of an inability to conduct himself in accordance with the provisions of any type of community-based court sentencing." In highlighting the seriousness of the offense, the court noted that "[t]his was one of the more violent domestic violence cases [it] has presided over. Obviously, it's inherent in the elements of the offense, aggravated domestic battery, that there is violence, but not every case involves strangulation, and strangulation to the point where the victim was almost passing out." In considering the statutory factors in mitigation and aggravation, the court concluded an extended-term sentence was necessary. In mitigation, the court found defendant had a long history of substance abuse and mental health issues, and his attitude in court had been remorseful. The court then identified the following aggravating factors:

> "THE COURT: On the other hand, the aggravating factors, you did cause serious harm. You have a history of prior delinquency or criminal activity. The sentence here is necessary to deter others. You are, obviously, not the only person in this state that thinks that they can control women when they don't get their way by violence. We deal with that every day, so we need to deter others by the sentence here today; and, of course, this crime occurred while you were on parole, on mandatory supervised release, and you were in a position of trust, being the father of [Lacey S.'s] child.
>
> So all of those factors apply. All of those point to a higher sentence. Like I said before, I think an extended term is necessary."

- 10 -

The court then sentenced defendant to 10 years' imprisonment.

¶ 30                              E. The Motion to Reconsider Sentence

¶ 31         On September 21, 2022, defendant *pro se* filed a motion to reconsider sentence. He asked the trial court to reduce his sentence to seven years' imprisonment, citing several cases in which the defendants had received sentences of seven years or less for aggravated domestic battery. On January 24, 2023, following a hearing, the court denied defendant's motion.

¶ 32         This appeal followed.

¶ 33                              II. ANALYSIS

¶ 34         On appeal, defendant argues the trial court erred in sentencing him to ten years' imprisonment by improperly considering in aggravation (1) an element inherent in the offense and (2) that he held a position of trust in relation to the victim. Defendant acknowledges he forfeited his argument by failing to object at the sentencing hearing and raise the issue in his motion to reconsider sentence, but he nonetheless asks this court to review it under the plain-error doctrine. See, *e.g.*, *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required.").

¶ 35                    A. The Plain-Error Doctrine and Standard of Review

¶ 36         The plain-error doctrine is a "narrow and limited exception" to the general rules of forfeiture. *Hillier*, 237 Ill. 2d at 545. To obtain relief under the doctrine, a defendant first must demonstrate that a clear or obvious error occurred. *Id.* If the defendant successfully does so, he "must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.* The

- 11 -

defendant bears the burden of persuasion under both prongs of the plain-error doctrine. *Id.* "If the defendant fails to meet his burden, the procedural default will be honored." *Id.*

¶ 37    The Corrections Code (730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2022)) sets forth mitigating and aggravating factors a trial court must consider in fashioning an appropriate sentence. *People v. Brunner*, 2012 IL App (4th) 100708, ¶¶ 43-45. "Although the imposition of sentence is generally a matter of judicial discretion [citation], the question of whether a court relied on an improper factor in imposing a sentence ultimately presents a question of law to be reviewed *de novo*." (Internal quotation marks omitted.) *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49.

¶ 38                    B. Whether the Trial Court
            Considered Improper Factors in Aggravation

¶ 39    Defendant argues that in sentencing him to ten years' imprisonment, the trial court improperly considered in aggravation (1) an element inherent in the offense and (2) that he held a position of trust in relation to the victim.

¶ 40                    1. *Element Inherent in the Offense*

¶ 41    Defendant argues the trial court improperly considered in aggravation an element inherent in the offense of aggravated domestic battery. Specifically, defendant contends the court improperly considered the fact that he strangled Lacey S., thereby causing serious harm, as an aggravating factor.

¶ 42    An improper double enhancement occurs when, in relevant part, "a single factor is used both as an element of an offense and as a basis for imposing a harsher sentence than might otherwise have been imposed." *People v. Garcia*, 2018 IL App (4th) 170339, ¶ 29. The Corrections Code provides that a trial court may consider a defendant's conduct to constitute an aggravating factor when that "conduct caused or threatened serious harm." 730 ILCS

5/5-5-3.2(a)(1) (West 2022). In considering whether the defendant's conduct "caused or threatened serious harm," the court "compares the conduct in the case before it against the minimum conduct necessary to commit the offense." *Hibbler*, 2019 IL App (4th) 160897, ¶ 67. As the supreme court explained in *People v. Saldivar*, 113 Ill. 2d 256, 269 (1986), a sentencing court may consider the harm caused as an aggravating factor even in situations where serious harm is inherent in the offense committed by a defendant:

> "Certain criminal conduct may warrant a harsher penalty than other conduct, even though both are technically punishable under the same statute. Likewise, the commission of any offense, regardless of whether the offense itself deals with harm, can have varying degrees of harm or threatened harm. The legislature clearly and unequivocally intended that this varying quantum of harm may constitute an aggravating factor. While the classification of a crime determines the sentencing range, the severity of the sentence depends upon the *degree of harm* caused to the victim and as such may be considered as an aggravating factor in determining the exact length of a particular sentence, *even in cases where serious bodily harm is arguably implicit in the offense for which a defendant is convicted*." (Emphases in original.).

¶ 43　　　　"A person who, in committing a domestic battery, strangles another individual commits aggravated domestic battery." 720 ILCS 5/12-3.3(a-5) (West 2018). "Strangle," in this context, "means intentionally impeding the normal breathing or circulation of the blood of an individual by applying pressure on the throat or neck of that individual or by blocking the nose or mouth of that individual." *Id.* Aggravated domestic battery is a Class 2 felony with a nonextended-term sentencing range of 3 to 7 years' imprisonment and an extended-term

- 13 -

sentencing range of 7 to 14 years' imprisonment. *Id.* § 12-3.3(b); 730 ILCS 5/5-4.5-35(a) (West 2018).

¶ 44　　　　Here, after finding a sentence of imprisonment was necessary, the trial court stated the following: "This was one of the more violent domestic violence cases this Court has presided over. Obviously, it's inherent in the elements of the offense, aggravated domestic battery, that there is violence, but not every case involves strangulation, and strangulation to the point where the victim was almost passing out."

¶ 45　　　　We find it was not improper for the trial court to consider in aggravation the fact that defendant strangled Lacey S. until she almost passed out. Contrary to defendant's assertion, the court did not merely consider the fact that defendant strangled the victim, without considering the unique nature of that act. Instead, the court found defendant strangled the victim to an extent beyond that which was necessary to establish that element of the offense. See *Hibbler*, 2019 IL App (4th) 160897, ¶ 67 (noting that, in considering whether the defendant's conduct "caused or threatened serious harm," the court "compares the conduct in the case before it against the minimum conduct necessary to commit the offense"). The court explicitly stated that not every aggravated domestic battery involved "strangulation to the point where the victim was almost passing out." As the supreme court noted in *Saldivar*, a sentencing court is permitted to consider the degree of harm caused by a defendant's conduct, even where harm is inherent in the offense. *Saldivar*, 113 Ill. 2d at 269. Thus, while it is true strangulation is inherent in the offense for which defendant was convicted, not every act of strangulation leads to the victim nearly passing out, and the court could properly consider the greater degree of harm defendant caused in this case. Moreover, the record supports the court's finding. At trial, Lacey S. testified that defendant squeezed her neck "extremely hard" for approximately ten seconds until she

"started to see black spots" and "felt like [her] eyes were going to pop out." Accordingly, the court did not err in considering as a factor in aggravation that defendant strangled Lacey S..

¶ 46                                    2. *Position of Trust*

¶ 47          Defendant additionally argues the trial court improperly considered in aggravation that he held a position of trust in relation to Lacey S. Defendant contends the statutory aggravating factor related to holding a position of trust is inapplicable under the circumstances because it only applies in cases involving certain enumerated sex offenses and a victim under the age of 18. The State asserts the court did not indicate defendant held a position of trust in relation to Lacey S., but instead "the position of trust the court considered was that of defendant being the father of the six-year-old child." According to the State, "defendant's knowledge of the presence of a six-year-old child and the possible effect of his actions on her psychologically should be and is a non-statutory factor in aggravation."

¶ 48          Section 5-5-3.2(a) of the Corrections Code lists the statutory factors a trial court may consider in aggravation when imposing sentence. 730 ILCS 5/5-5-3.2(a) (West 2022). Subsection (a)(14) provides that the court may consider in aggravation that a defendant held a position of trust or supervision in relation to a victim under the age of 18 where the defendant committed one of several enumerated sex offenses. *Id.* § 5-5-3.2(a)(14).

¶ 49          Here, in identifying the applicable aggravating factors, the trial court stated, in pertinent part, that defendant was "in a position of trust, being the father of [Lacey S.'s] child." This statutory factor did not apply in this case. Defendant was acquitted of the criminal sexual assault charges, and Lacey S. was not a victim under the age of 18. See *id.* Thus, we agree with defendant that the court considered an improper factor in aggravation.

¶ 50     The State contends the trial court was actually referring to defendant's daughter, not Lacey S., when it stated that defendant held a position of trust. However, the State's contention is clearly contradicted by the record. In recommending a 13-year prison sentence, the State identified five statutory factors in aggravation. It stated the following with respect to the fifth and final aggravating factor: "And Subsection 14, the last section that applies is that the defendant held a position of trust or supervision over another, such as a family or household member, *and that's what [Lacey S.] is*." (Emphasis added.). Notably, when the court recited the five factors it had considered in aggravation, its recitation mirrored exactly the five statutory factors previously identified by the State. Thus, when the court stated, "[Y]ou were in a position of trust, being the father of [Lacey S.] child," it is apparent the court was referring to defendant's position relative to Lacey S., not the child. Accordingly, we reject the State's contention and find the court erred in considering this statutory factor in aggravation.

¶ 51          C. Whether Defendant Established Plain Error

¶ 52     Having found the trial court considered an improper factor in aggravation, we must next determine whether the error constitutes plain error. As noted above, after establishing that a clear or obvious error occurred, defendant "must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 545. Defendant argues that both prongs apply. We disagree.

¶ 53          1. *The Evidence Was Not Closely Balanced*

¶ 54     First, defendant argues that the evidence at the sentencing hearing "was closely balanced because there were multiple mitigating factors in [his] favor." Specifically, he points to (1) the fact his parents divorced when he was a child, (2) his ADHD diagnosis and "struggle[s]

with anxiety and depression," (3) his substance abuse history, (4) the character letters submitted to the court on his behalf, and (5) his work with substance abuse treatment groups while incarcerated.

¶ 55　　　　After considering this purported mitigating evidence, we cannot say it was closely balanced when compared with the evidence in aggravation. Defendant committed a violent act that caused physical and emotional harm to Lacey S. Moreover, he did so after having been previously convicted of committing aggravated domestic battery and domestic battery against Bianca R. and Lacey S., respectively. We note the domestic battery involving Lacey S. in 2015 occurred while defendant was on probation for his aggravated domestic battery conviction involving Bianca R.. According to Bianca R., during the attack against her, defendant "tossed [her] around" and strangled her until she passed out. Regarding the assault in this case, Lacey S. testified defendant strangled her close to the point of unconsciousness. In his testimony, defendant admitted he "squeeze[d]" Lacey S.'s neck and threw her to the floor by her hair. Defendant had also been convicted of a third felony and three misdemeanors. The evidence in aggravation demonstrated that a lengthy prison sentence was warranted. Ultimately, defendant was sentenced to 10 years in prison which was just below the midpoint of the extended-term sentencing range of 7 to 14 years. For these reasons, we find defendant has failed to establish that the evidence at sentencing was closely balanced.

¶ 56　　　　　2. *Defendant Was Not Denied a Fair Sentencing Hearing*

¶ 57　　　　Alternatively, defendant argues we may consider his claim under the second prong of plain error review. His argument in this regard consists of just two sentences: "This issue can also be considered under the second prong of plain error review because it deprived [him] of a fair sentencing hearing. Courts have reviewed the consideration of an improper

sentencing factor as second-prong plain error." Defendant does not explain how the trial court's consideration of an improper sentencing factor here deprived him of a fair sentencing hearing. Essentially, defendant is asking this court to find that a sentencing court's consideration of an improper sentencing factor, by itself, necessarily constitutes second-prong plain error. We previously rejected this notion in *People v. Johnson*, 2017 IL App (4th) 160920, ¶ 56, and we do so again in this case.

¶ 58                                    III. CONCLUSION

¶ 59           For the reasons stated, we affirm the trial court's judgment.

¶ 60           Affirmed.